**Joseph B. FONTENOT, and Ann Fontenot, Plaintiffs–Appellants.**

v.

**AWI, INC., et al., Defendants,**

**The Western Atlas International, Defendant–Appellee.**

No. 90–3189.

United States Court of Appeals, Fifth Circuit.

Feb. 15, 1991.

Gary J. Ortego, Ortego & Dupre, Ville Platte, La., for plaintiffs-appellants.

Julie DiFulco Robles, Richard A. Chopin, Hailey, McNamara, Hall, Larmann & Papale, Metairie, La., for defendant-appellee.

Before WISDOM, GEE, and HIGGINBOTHAM, Circuit Judges.[*]

WISDOM, Circuit Judge:

Joseph B. Fontenot and his wife, Ann Fontenot, sued his employer, Western Atlas International, Inc. ("Western Atlas"), and others, under the Jones Act and general maritime tort principles, for injuries that he sustained while off-loading his tool box from a crewboat that was docked in naviga-

---

[*] This opinion was concurred in by Judge Gee prior to his resignation from the Court on February 1, 1991.

ble waters at Motto's Landing in Buras, Louisiana. Western Atlas moved for summary judgment on the grounds that the Longshore and Harbor Workers' Compensation Act (the "LHWCA")[1] was Fontenot's exclusive remedy against his employer. The trial judge granted the motion, finding that Fontenot was covered by the exclusive remedy provision of the LHWCA.[2] Fontenot appeals, arguing that he is not covered by the LHWCA.[3] We affirm.

I

There is no dispute concerning the material facts. Fontenot started with N.L. McCullogh, an oil field service company, in 1971. Over the years, he worked in various positions for N.L. McCullogh. At some point between 1971 and 1988, Western Atlas acquired N.L. McCullogh. With the acquisition, Fontenot became an employee of Western Atlas, continuing his work as a wireline operator. At the time of the accident in 1988, Fontenot was still working as a wireline operator for Western Atlas, and held the title "Pipe Recovery Specialist".

Because he worked for a service company, Fontenot was not permanently assigned to a specific platform, drilling vessel, or oil field. Instead, the operators of various oil production facilities, onshore, in state waters, and in federal waters, would contact Atlas requesting specific wireline services. Such services include running a well log, perforating a section of pipe, or setting off wireline charges to assist in pipe recovery operations. Atlas had a number of two-man crews that it would send out to the specified location, where the crew would stay only long enough to complete the requested task.

On the day of the accident, a crewboat[4] was returning Fontenot and James Black, another Atlas employee, from an inland barge rig located in Louisiana state waters. The crewboat docked in navigable waters at Motto's Landing in Buras, Louisiana. When the crewboat docked, Black went to get the company truck from the parking lot, and Fontenot began unloading their equipment from the deck of the crewboat onto the dock. According to Fontenot:

> [M]y tool box was the last thing I picked up. I picked it up, and I turned around, and the boat moved a little. I slipped, and I caught myself; and, I felt my back hurt.

Asked if he was still on the boat when the injury occurred, Fontenot replied: "Yes."

Fontenot also testified that he spent approximately forty percent of his time for Western Atlas onshore, thirty percent on fixed platforms,[5] and thirty percent on oil exploration and production vessels, such as the inland barge from which he was returning when he injured himself.

After the accident, Fontenot received compensation under the Louisiana Worker's Compensation provisions.[6] Fontenot, through his attorney, reported the injury to the United States Department of Labor (the "Department") and requested a finding by the Department that Fontenot was eligible for coverage under the LHWCA. The Department made such a finding in January of 1989: "The report [filed by Fontenot] shows the injury falls within the purview of the Longshore and Harbor Worker's Compensation Act, as extended."

---

**1.** 33 U.S.C.A. §§ 901–950 (West 1986).

**2.** 33 U.S.C.A. § 905(a) (West 1986).

**3.** In their brief on appeal, counsel for the appellants stated that the district court "has decided Joseph B. Fontenot is not a seaman under the Jones Act and therefore this issue will not be addressed herein." Although Fontenot did spend thirty percent of his time on oil production vessels, he cannot be considered a seaman under the Jones Act because he did not perform his work on an "identifiable group of vessels acting together or under one control." *See Bar-*

*rett v. Chevron, U.S.A., Inc.,* 781 F.2d 1067, 1074 (5th Cir.1986) (en banc).

**4.** It is not entirely clear who actually owned and operated the crewboat, but the evidence showed that Western Atlas did not.

**5.** The record does not show how much of his time he spent on fixed platforms in federal, as opposed to state, waters.

**6.** La.Rev.Stat.Ann. §§ 23:1021–23:1379 (West 1985).

His attorney also wrote CNA Insurance, Western Atlas's insurer, and stated:

> After discussing the matter with his employer, it is quite clear to me that Mr. Fontenot is not due and owing worker's compensation but Longshore [and] Harbor Worker's Act compensation....
>
> Based on the information I have received and that has *previously* been provided to you, I am demanding on behalf of Mr. Joseph R. Fontenot that his true compensation under the Longshore [and] Harbor Worker's Act of $633.00 per week be paid to him from the date of the accident until this date and thereafter until this matter is concluded. I understand that you will receive a credit for the worker's compensation of $524.00 you were paying every two weeks, but the balance and compensation forward should be at the maximum amount stated above.[7]

Not content with the $633 per week plus medical expenses he was receiving under the LHWCA, Fontenot filed suit on April 19, 1989, in the Eastern District of Louisiana. He sued his employer, Western Atlas, and others, alleging that he was not in fact a covered employee within the LHWCA, rather, he was a seaman entitled to pursue relief under the Jones Act,[8] or, alternatively, was entitled to relief under general maritime tort principles.[9]

Western Atlas requested summary judgment on Fontenot's claims, arguing that the LHWCA covered Fontenot and was his exclusive remedy against his employer. The trial court held that Fontenot was covered by the LHWCA and granted summary judgment in favor of Western Atlas. Fontenot and his wife appeal.

## II

■ The only question the parties present is whether Fontenot satisfied both the status and situs tests, for coverage under the LHWCA.[10] Although neither party disputes that Fontenot satisfied the situs test,[11] Fontenot argues that the decision of the Court in *Herb's Welding, Inc. v. Gray*[12] requires a determination that he did not satisfy the status test. We cannot agree.

The *Gray* Court held that a welder injured while working on a fixed oil production platform in state waters was not engaged in "maritime employment" within the meaning of the LHWCA.[13] The Court did not address the status of an oil field employee injured while in transit on navigable waterways,[14] or one who spent a substantial period of his time working on drilling vessels, rather than fixed platforms.[15]

This case presents both issues. Fontenot injured himself while on a vessel in navigable waters.[16] And Fontenot spent thirty

---

7. Letter from Gary J. Ortego, Fontenot's attorney, to CNA Insurance Companies (Aug. 3, 1988) (emphasis in original).

8. 46 U.S.C.A.App. § 688 (West Supp.1990).

9. Because of our resolution of the LHWCA issue, we do not address whether an injured employee who can satisfy the requirements of admiralty jurisdiction, but is neither a LHWCA maritime employee nor a Jones Act seaman, can sue his employer under general maritime tort principles. Worker's compensation under state law may be a more appropriate remedy for such injured workers. *Compare Director, Office of Workers' Compensation Programs v. Perini North River Associates*, 459 U.S. 297, 320 n. 30, 103 S.Ct. 634, 649 n. 30, 74 L.Ed.2d 465 (1983), *with id.*, 459 U.S. at 339–40, 103 S.Ct. at 658–59 (Stevens, J. dissenting).

10. *See Herb's Welding, Inc. v. Gray*, 470 U.S. 414, 415–46, 105 S.Ct. 1421, 1423–39, 84 L.Ed.2d 406 (1985); *Northeast Marine Terminal Co. v. Capu-*

to, 432 U.S. 249, 264–65, 97 S.Ct. 2348, 2357–58, 53 L.Ed.2d 320 (1977).

11. He was injured on a vessel in navigable waters.

12. 470 U.S. 414, 105 S.Ct. 1421, 84 L.Ed.2d 406 (1985).

13. 470 U.S. at 425–26, 427, 105 S.Ct. at 1428–29.

14. *See Gray*, 470 U.S. at 424 n. 10, 427 n. 13, 105 S.Ct. at 1428 n. 10, 1429 n. 13.

15. *See Gray*, 470 U.S. at 416 n. 2, 105 S.Ct. at 1424 n. 2.

16. He also was in the process of unloading the Western Atlas equipment when he injured himself. Because we are uncertain whether this unloading differs sufficiently from that in *Gray*, 470 U.S. at 425, 105 S.Ct. at 1428 ("Gray's welding work was far removed from traditional

**1130**

percent of his time working on oil production vessels, and was returning from a job on such a vessel when he injured himself.[17] We hold that the first fact satisfies the status test for coverage under the LHWCA, and address but leave open the question of whether the second would satisfy the status test.

First, we address the issue whether an oil production worker injured in the course of his employment while on actual navigable waters satisfies the status test. In 1972, Congress amended the LHWCA to provide coverage for maritime employees injured on "any ... pier, wharf, dry dock, terminal, building way, maine way, or other ... area customarily used by an employer in loading, unloading, repairing, or building a vessel...." adjoining a navigable waterway.[18] Before 1972, the LHWCA covered only those injuries sustained "on the actual 'navigable waters of the United States (including any dry dock).'"[19] In *Director, Office of Workers' Compensation Programs v. Perini North River Associates*,[20] the Court distinguished employees injured on actual navigable waters from those injured on the adjoining areas added by the 1972 Amendments. For those employees injured on actual navigable waters, the Court recognized that they would have been covered before the 1972 Amendments.[21] Because, the Court reasoned, Congress intended to expand, and not restrict, coverage by the 1972 Amendments, an employee satisfied the status test if the employee was injured "on the navigable waters in the course of [his] employment as

that coverage existed before the 1972 Amendments."[22] The *Gray* Court recognized the continued validity of *Perini North River Associates*.[23] Its opinion, therefore, must be read to address the scope of the phrase "maritime employment" only for those employees not on actual navigable waters at the time of their injury.

After *Gray* and *Perini North River Associates*, the status test reflects a dual inquiry. First, if the employee was injured while on actual navigable waters, in the course of his employment, then he is engaged in maritime employment and satisfies the status test under *Perini North River Associates*.[24] Second, if he was not injured on actual navigable waters at the time of the injury, then the employee is engaged in "maritime employment" only if his work is directly connected to the commerce carried on by a ship or vessel, under *Gray*.

In this case, Fontenot injured himself while on the crewboat. The crewboat was docked in actual navigable waters. Therefore, under the first part of the test, announced in *Perini North River Associates*, Fontenot, at the time of his injury, satisfied the status requirement of the LHWCA.

Fontenot's work on oil production vessels may also qualify as maritime employment under *Gray*. In footnote 2 of its decision in *Gray*, the Court stated:

> Offshore oil rigs are of two general sorts: fixed and floating. Floating structures have been treated as vessels

---

LHWCA activities, notwithstanding the fact that he unloaded his own gear upon arriving at a platform by boat."), we do not rely on the fact that Fontenot was unloading the Western Atlas equipment at the time of his injury.

**17.** In *Chesapeake & Ohio Ry. Co. v. Schwalb*, three justices joined in the majority opinion, but concurred specially and expressed the view that so long as an employee "'spends some of his time in indisputably longshoring operations'", then the employee is covered by the LHWCA even if he was not so engaged at the specific time of his injury. —— U.S. ——, ——, 110 S.Ct. 381, 387, 107 L.Ed.2d 278, 289 (1990) (quoting *Northeast Marine Terminal Co.*, 432 U.S. at 273, 97 S.Ct. at 2362).

**18.** Longshoremen's and Harbor Workers' Compensation Act Amendments of 1972, Pub.L. No. 92–576, § 2, 86 Stat. 1251.

**19.** *Perini North River Associates*, 459 U.S. at 299, 103 S.Ct. at 637–38 (quoting 1927 LHWCA, 44 Stat. (part 2) 1426).

**20.** 459 U.S. 297, 103 S.Ct. 634, 74 L.Ed.2d 465 (1983).

**21.** 459 U.S. at 311, 103 S.Ct. at 644.

**22.** 459 U.S. at 325, 103 S.Ct. at 651.

**23.** 470 U.S. at 425, 105 S.Ct. at 1428.

**24.** 459 U.S. at 324, 103 S.Ct. at 650–51.

by the lower courts. Workers on them, unlike workers on fixed platforms, enjoy the same remedies as workers on ships. If permanently attached to the vessel as crewmembers, they are regarded as seamen; if not, they are covered by the LHWCA because they are employed on navigable waters.[25]

The footnote seems to recognize LHWCA coverage for non-crew workers on oil production vessels.

The reasoning of the *Gray* Court also justifies our drawing a distinction between oil field workers on vessels and those on fixed platforms in state waters. In denying coverage to a welder on a fixed platform in state waters, the Court wrote:

> The history of the Lands Act at the very least forecloses the Court of Appeals' holding that offshore drilling is a maritime task and that any task essential thereto is maritime employment for LHWCA purposes.[26]

The Court also relied on the fact that building platforms and constructing pipelines are not inherently maritime tasks because they can "also [be] performed on land."[27]

But neither rationale applies to oil production operations from vessels. First, while the Lands Act applies to fixed oil production platforms in state waters, it does not apply to oil production vessels;[28] therefore, its legislative history provides no guidance on the maritime nature of oil production operations conducted from vessels. Second, while wireline work can be unconnected with maritime commerce, so too can the unloading and loading, and construction activities that the Court recognizes as the focus of the maritime employment test.[29] For example, an employee might unload one train, and load another; or an employee might engage in construction activities, but build an airplane instead of a ship. Nothing intrinsic in any of these activities establishes their maritime nature, rather it is that they are undertaken with respect to a ship or vessel.[30] When the tasks are undertaken to enable a ship to engage in maritime commerce, then the activities become "maritime employment".

Thus, were *Gray* the last word on the status inquiry, we would consider a task to be maritime employment if it was done to enable a ship or vessel to engage in maritime commerce, unless it was specifically excluded by the LHWCA.[31] Combined with the situs requirement, this interpretation would limit recovery under the LHWCA to those workers employed in and around navigable waters whose work enables a ship or vessel to play its role in the maritime industry. And we would be prepared to hold that Fontenot, because his work directly enabled the oil production barge to carry out its role in maritime commerce, was engaged in maritime employment under the second part of the status inquiry announced in *Gray*.

But in *Chesapeake & Ohio Railway Company v. Schwalb,*[32] the Court stated that employees whose positions were not specifically enumerated in section 902[33] are covered by the LHWCA only if the employees are engaged "in activity that is an integral part of and essential to the overall

**25.** 470 U.S. at 416 n. 2, 105 S.Ct. at 1424 n. 2 (citations omitted).

**26.** 470 U.S. at 422, 105 S.Ct. at 1426–27 (footnote omitted).

**27.** 470 U.S. at 424 n. 10, 105 S.Ct. at 1428 n. 10.

**28.** Cf. *Rodrigue v. Aetna Casualty & Sur. Co.,* 395 U.S. 352, 89 S.Ct. 1835, 23 L.Ed.2d 360 (1969).

**29.** *Gray,* 470 U.S. at 424, 105 S.Ct. at 1427–28; see also *Schwalb,* —— U.S. at ——–——, 110 S.Ct. at 384–86, 107 L.Ed.2d at 286–87.

**30.** Cf. *Gray,* 470 U.S. at 423–25, 105 S.Ct. at 1427–28.

**31.** 33 U.S.C.A. § 902(3)(A)–(H) (West 1966).

**32.** —— U.S. ——, 110 S.Ct. 381, 107 L.Ed.2d 278 (1990).

**33.** Section 902(3) provides, in relevant part: The term "employee" means any person engaged in maritime commerce, including any longshoreman or other person engaged in longshoring operations, and any harbor-worker including a ship repairman, shipbuilder, and ship-breaker....

33 U.S.C.A. § 902(3) (West 1986).

processes [of loading and unloading]."[34] Because the Court was addressing the case of a mechanic who repaired the machines used to load and unload ships, we cannot be certain that the Court meant to exclude, from LHWCA coverage, employees such as Fontenot, who, like longshoremen, face "maritime hazards" in the course of their employment.[35] Therefore, we leave open the question whether an employee would be considered to be engaged in maritime employment under *Gray* if he spends a considerable portion of his time working on oil production vessels, rather than platforms, even though not on actual navigable waters at the time of his injury.

Because he was on "navigable waters", as that term was defined prior to the 1972 Amendments to the LHWCA, Fontenot satisfied both the status and situs tests. Fontenot is, therefore, covered by the LHWCA, and the LHWCA provides his exclusive remedy against his employer. The trial judge properly granted summary judgment in favor of Western Atlas.

### III

We have some concerns about this case which we consider it appropriate to express. By addressing Fontenot's status under the LHWCA, we are not implying that a plaintiff may seek a redetermination of the coverage question in a district court once the Department has ruled that an injured worker is covered by the LHWCA.

Worker's compensation laws, like the LHWCA, typically replace a negligence action with an administrative system as the method for determining an employee's right to, and amount of, compensation for injuries sustained on the job. As the Supreme Court has stated:

> [T]he [LHWCA] is not a simple remedial statute intended for the benefit of the workers. Rather, it was designed to strike a balance between the concerns of the longshoremen and harbor workers on the one hand, and the employers on the other. Employers relinquished their defense to tort actions in exchange for limited and predictable liability. Employees accept the limited recovery because they receive prompt relief without the expense, uncertainty, and delay that tort actions entail.[36]

Essentially, both the employer and the employee gave up the right to a trial, which could be slow, expensive, and uncertain, in exchange for, hopefully, a quicker, less expensive, and more certain administrative system.

Permitting a trial court to redetermine issues decided by the administrative system effectively defeats the purpose of the LHWCA. Instead of creating certainty for both employer and employee, permitting a trial court to redetermine the coverage issue reintroduces uncertainty for both. Instead of lowering the cost of recovery for an injured worker, the worker must pay counsel both for representation on the LHWCA claim and again in seeking a jury award.[37] Furthermore, if we permit a trial court and the Department to reach inconsistent determinations of the coverage issue, an injured worker may receive both a jury trial and an LHWCA remedy,[38] or

---

**34.** *Schwalb,* —— U.S. at ——, 110 S.Ct. at 385, 107 L.Ed.2d at 287.

**35.** H.R.Rep. No. 570, 98th Cong., 2nd Sess., pt. 1, at 3, *reprinted in,* 1984 U.S.Code Cong. & Admin.News 2734, 2736.

**36.** *Morrison–Knudsen Constr. Co. v. Director, Office of Workers' Compensation,* 461 U.S. 624, 636, 103 S.Ct. 2045, 2052, 76 L.Ed.2d 194 (1983); *see also Peter v. Hess Oil Virgin Islands Corp.,* 903 F.2d 935, 951 (3d Cir.1990).

**37.** Ideally, a worker's compensation system benefits both the average injured employee and the employer. By reducing the costs associated with the liability determination, primarily attor-ney's fees, the administrative system can provide the average injured worker with a higher net recovery at a lower cost to the employer. *Cf.* Friedman & Ladinsky, *Social Change and the Law of Industrial Accidents,* 67 Colum.L. Rev. 50, 66–67, 71–72 (1967).

**38.** While the LHWCA provides that prior awards under state worker's compensation systems or under the Jones Act will be credited against subsequent LHWCA awards for the same injury, 33 U.S.C.A. § 903(e) (West 1986), this "crediting" practice does not protect the employer against the *risk* of a larger jury award, as intended by Congress in enacting the administrative system. Thus, when Professor Larson

neither,[39] despite the intention of Congress that he receive one or the other.[40] In enacting the LHWCA, Congress intended that it be the sole and exclusive remedy for workers within its scope, not a stepping stone on the way to a jury award.

While we recognize that there are differences between the fact-finding processes in the administrative forum and in the judicial forum, we doubt that these differences are sufficient to deprive an injured employee of a fair opportunity to present the coverage issue before the Department.[41] As a result, a finding of LHWCA coverage sought and obtained by the injured worker from

comments that: "If it turns out later that he is entitled to a more generous award under a different system, since the compensation award will be credited on the larger award, there has been no serious harm done," 4 A. Larson, Workmen's Compensation Law § 90.51, at 16–366 to 16–367 (1983), he has missed the entire basis for the switch from a tort system to a compensation system: eliminating the *risk* of a trial for both the employee *and* the employer. Cf. *Peter*, 903 F.2d at 952.

**39.** If we permit inconsistent coverage determinations, the Department could find that an injured employee is a seaman and deny compensation under the LHWCA; and in a subsequent (or prior) Jones Act suit, the district court might find that the employee is not a seaman, and, hence, dismiss the action.

**40.** See *Simms v. Valley Line Co.*, 709 F.2d 409, 411 (5th Cir.1983); *McDermott, Inc. v. Boudreaux*, 679 F.2d 452, 459 (5th Cir.1982).

**41.** In two prior cases, we have permitted inconsistent determinations of the coverage issue because of the differing evidentiary rules and presumptions favoring the injured worker in the administrative forum. See *Strachan Shipping Co. v. Shea*, 406 F.2d 521, 522 (5th Cir.) (per curiam), *cert. denied*, 395 U.S. 921, 89 S.Ct. 1773, 23 L.Ed.2d 238 (1969); *Young & Co. v. Shea*, 397 F.2d 185, 188–89 (5th Cir.1968), *cert. denied*, 395 U.S. 920, 89 S.Ct. 1771, 23 L.Ed.2d 237 (1969); *see also Newport News Shipbuilding & Drydock Co. v. Director, Office of Workers' Compensation Programs*, 583 F.2d 1273, 1278–79 (4th Cir.1978), *cert. denied*, 440 U.S. 915, 99 S.Ct. 1232, 59 L.Ed.2d 465 (1979). (We also addressed the issue prematurely in *Boatel, Inc. v. Delamore*, 379 F.2d 850, 854–56 (5th Cir.1967). See *Young & Co.*, 397 F.2d at 187.) Since that time, the Court has stated that the relevant inquiry is whether the differences in procedure deprived the litigant of a fair opportunity to present the issue in the administrative forum. See *Kremer v. Chemical Constr. Corp.*, 456 U.S. 461, 480–82, 102 S.Ct. 1883, 1896–98, 72 L.Ed.2d

the Department should preclude any subsequent action against his employer for the same injury. But we do not decide the issue for two reasons. First, we have held that Fontenot is a covered employee; as a result, a decision on this issue would not affect the outcome of this case. Second, the parties have not raised this issue either at trial or on appeal.

## IV

We hold that Fontenot is covered by the LHWCA because he was on actual navigable waters in the course of his employment at the time of his injury.

262 (1982). Neither difference appears sufficient to deprive Fontenot of a fair opportunity to present the coverage issue to the Department. First, more permissive evidentiary rules are common in administrative tribunals; they reflect a considered judgment, by Congress, that much of the evidence kept from the jury (at least in part from a fear that the jury will accord too much weight to the evidence) can contribute to more accurate decision making by an administrative body. Because the more permissive evidentiary rules do not undermine the accuracy of the fact-finding process, they do not deprive an injured worker of a fair opportunity to litigate the issue before the Department. Cf. 18 C. Wright, A. Miller & E. Cooper, Federal Practice and Procedure § 4422, at 215–16 (1981). Second, the presumptions contained in section 920 of the LHWCA represent a decision by Congress to expand the class of employees covered by the LHWCA. 33 U.S.C.A. § 920(a) (West 1986). Unlike the higher standard of proof in a criminal case, the presumptions do not justify permitting a redetermination of the coverage issue in a district court. The "beyond a reasonable doubt" standard is designed to protect the defendant from *criminal* sanctions. When criminal sanctions are not present, there is no reason to require a litigant to satisfy the criminal standard, and hence we say it would be unfair to bind a litigant in a civil case to findings made under the criminal standard of proof. In contrast, even if an injured worker is covered by the LHWCA solely because of the section 920 presumptions, he is still a covered employee. Congress intended all covered employees to accept both the benefits and the burdens of the LHWCA: every covered employee receives a quick, certain recovery, but gives up his right to seek any other recovery from his employer for the same injury. Hence, the presumptions do not make it unfair to bind a litigant, in a subsequent tort action, to a determination of coverage made by the Department, even though the section 920 presumptions may cause the Department to reach a result different from the one that would have been reached through a trial.

**1134**

The judgment of the district court is AFFIRMED.

PATRICK E. HIGGINBOTHAM, Circuit Judge, concurring:

I concur in the conclusion reached by Judge Wisdom's able opinion and with much of its reasoning. I write separately, but briefly, to accent what we do not decide and to explain my differing view, an exercise I would not undertake if these issues appeared infrequently. I think it clear that Fontenot falls within the LHWCA's coverage. He was injured while in transit on navigable waters, he spent thirty percent of his time working on vessels, *and* he was returning from work on a vessel at the time of his injury. We do not decide more. We do not reach the case, for example, of injury in transit on navigable waters of a worker on fixed platforms.

I must depart from the discussion of *Herb's Welding* and *Chesapeake*, as applied to workers on vessels. *Herb's Welding* and *Chesapeake* address the LHWCA's status test in the context of a *land-based* or other *non-vessel* situs. After *Perini*, and the second footnote in *Herb's Welding*, any work on a vessel in navigable waters in the course of employment is maritime employment; the character of the work is irrelevant. "[W]hen a worker is injured on the actual navigable waters in the course of his employment on those waters, he satisfies the status requirement in § 2(3) ..." *Perini*, 459 U.S. at 324, 103 S.Ct. at 650.

The parties saw the status issue in a different light; they focused on whether two of our cases, *Pippen v. Shell Oil Co.*, 661 F.2d 378 (5th Cir.1981), and *Boudreaux v. American Workover, Inc.*, 664 F.2d 463 (5th Cir.1981), survive *Herb's Welding*. Both cases involved wireline operators injured while working on floating barges; we held that they met the LHWCA's status test. It seems clear that the results in both cases survive *Herb's Welding*, but not all of the reasoning.