**IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT**

_____

No. 92-4380
_____


NOEL E. MUNGUIA,

                                    Petitioner,

DIRECTOR, OFFICE OF WORKERS' COMPENSATION PROGRAMS,
UNITED STATES DEPARTMENT OF LABOR,

                                    Respondent,


VERSUS

CHEVRON U.S.A. INC.,

                                    Respondent.


_____

Petition for Review of an Order of
the Benefits Review Board
_____

August 20, 1993

Before JOHNSON, SMITH, and EMILIO M. GARZA, Circuit Judges.

JERRY E. SMITH, Circuit Judge:

Noel Munguia appeals a decision of the Benefits Review Board (the "Board") of the United States Department of Labor, rejecting his claim for benefits under the Longshore and Harbor Workers' Compensation Act (the "Act"), 33 U.S.C. § 901 et seq. (1988), for injuries sustained while in the employ of Chevron, U.S.A., Inc. ("Chevron").  We affirm the Board's decision, but for reasons different from those relied upon by the Board.

Munguia had been employed by Chevron as a roustabout and relief pumper-gauger for nine years.  At the time he was injured, he had been assigned as a pumper-gauger to Chevron's South and Southwest Pass oil field for over two years.  The field includes about 200 producing oil wells drilled in an area eighteen miles long on both sides of, and a short distance from, the Mississippi River.  Each well is situated on a stationary platform built in the marsh or on water and is accessible only by water.

Munguia worked for seven days, then was off duty for seven days.  When on duty, he was provided sleeping quarters and meals in a bunkhouse, near which Chevron maintained a group of oil storage tanks, called a tank battery.  A number of vessels, varying from eight to twelve, were anchored at the tank battery, including small boats of various kinds (Lafitte skiffs, Boston whalers, and Jo-boats) fitted with outboard motors and other small vessels that could transport one or two workers and their equipment.  There was also at least one larger vessel, a wire-line barge, aboard which equipment needed for work on wells was permanently stored.  Chevron maintained this small fleet for the sole purpose of enabling its employees to service the production field.

On the day he was injured, Munguia was assigned to work with a gas specialist checking a number of wells for gas leaks.  They proceeded in a Lafitte skiff to check the valves on the well-control unit for leaks.  One of them would close the valve, and the other would listen for leaks.  Munguia injured his back while

attempting to close a frozen master valve.

## II.

Munguia's claim was referred for disposition to an administrative law judge ("ALJ"). Concluding that Munguia satisfied the "status" requirement of the Act and that the parties had not contested the "situs" requirement, the ALJ awarded Munguia his requested compensation benefits. Chevron appealed the decision to the Board.

Citing the transcript of the evidentiary hearing before the ALJ, the Board disagreed with the ALJ's statement that Chevron had not raised the situs issue. Addressing the merits, the Board then concluded that the scope of Munguia's employment did not satisfy the situs requirement, and it reversed the ALJ's decision on that ground. Munguia, joined by the Director of the Office of Worker's Compensation Programs (the "Director"), appeals.[1]

## III.

Our review of Board decisions is limited to considering errors of law and ensuring that the Board adhered to its statutory standard of review, namely, whether the ALJ's findings of fact are supported by substantial evidence and consistent with the law. 33 U.S.C. § 921(b)(3); Miller v. Central Dispatch, Inc., 673 F.2d 773,

---

[1] The Director is a party to the litigation of disputed claims under the Act at all stages of the litigation. See Ingalls Shipbuilding Div., Litton Systems, Inc. v. White, 681 F.2d 275, 281-88 (5th Cir. 1982), overruled on other grounds, Newpark Shipbuilding & Repair, Inc. v. Roundtree, 723 F.2d 399, 406-07 (5th Cir. 1984) (en banc).

778 (5th Cir. Unit A 1982).

In order to demonstrate coverage under the Act, a worker must satisfy both a situs and a status test; in the words of the statute, he must show that, at the approximate time he incurred disability or death, he was "engaged in maritime employment," 33 U.S.C. § 902(3), and that his injury "occurr[ed] upon the navigable waters of the United States . . . ."  Id. § 903(a) (1982).  See also Herb's Welding, Inc. v. Gray, 470 U.S. 414, 415-16 (1985).[2] These threshold inquiries were the focus of dispute before both the ALJ and the Board.

Section 902(3) of the Act, embodying the "maritime employment" status requirement, has been deemed "an occupational test that focuses on loading and unloading." P.C. Pfeiffer Co. v. Ford, 444 U.S. 69, 80 (1979).  While certain enumerated categories of employees )) e.g., longshoremen and harbor workers )) are automatically included within section 902(3)'s ambit, coverage may also extend to other employees.  A string of Supreme Court decisions addressing this issue has left it "clearly decided that, aside from the specified occupations, land-based activity occurring within the § 903 situs will be deemed maritime only if it is an integral or essential part of loading or unloading a vessel."

---

[2] Although the ALJ and, to a lesser extent, the Board phrase this two-part inquiry in terms of jurisdiction rather than coverage, it should be noted that jurisdiction is presumed under the Act.  See 33 U.S.C. § 920(a); New Orleans (Gulfwide) Stevedores v. Turner, 661 F.2d 1031, 1038 (5th Cir. Unit A Nov. 1981).  The presumption is, of course, rebuttable, but the burden of establishing jurisdiction (or the lack thereof) does not lie with the claimant.

4

<u>Chesapeake & Ohio R. R. v. Schwalb</u>, 493 U.S. 40, 45 (1989).[3]

The status test was added in the 1972 amendments to the Act, the purpose of which was to extend coverage to those injured in maritime employment on certain areas adjoining previously-covered sites but not actually <u>on</u> navigable waters. It thus "became necessary to describe affirmatively the class of workers Congress desired to compensate," <u>Caputo</u>, 432 U.S. at 264, and the status requirement was born.[4] But because Congress presumed that an employee injured upon navigable waters in the course of his employment had always been covered, and would remain covered, the Supreme Court has held that the added status requirement defines only the scope of the landward coverage extended by the 1972 amendments. <u>See</u> <u>Director v. Perini N. River Associates</u>, 459 U.S. 297, 317-19 (1983).

Thus the current status test, as our caselaw recognizes, presents a dual inquiry. Under <u>Perini</u>, an employee may be engaged in maritime employment if he was injured in the course of his employment while on navigable waters. If he was not on navigable waters at the time of his injury, however, he may satisfy the

---

[3] <u>See also</u> <u>Herb's Welding</u>, 470 U.S. at 423 ("Congress did not seek to cover all those who breathe salt air. Its purpose was to cover those workers on the situs who are involved in the essential elements of loading and unloading; it is `clear that persons who are on the situs but not engaged in the overall process of loading or unloading vessels are not covered.'" (Quoting <u>Northeast Marine Terminal Co. v. Caputo</u>, 432 U.S. 249, 267 (1977).).

[4] As the legislative history states, "[t]he Committee does not intend to cover employees who are not engaged in loading, unloading, repairing, or building a vessel, just because they are injured in an area adjoining navigable waters used for such activity." S. Rᴇᴘ. Nᴏ. 1125, 92d Cong., 2d Sess. 13 (1972); H. R. Rᴇᴘ. Nᴏ. 1441, 92d Cong., 2d Sess. 11 (1972).

status test only if his work "is directly connected to the commerce carried on by a ship or vessel, under Gray." Fontenot v. AWI, Inc., 923 F.2d 1127, 1130 (5th Cir. 1991).

It is undisputed that Munguia injured himself while working on one of the fixed well platforms in the Southwest Pass field. In Herb's Welding, the Supreme Court held that a welder injured while working on just such a fixed platform was not engaged in "maritime employment" and therefore was not covered by the Act.[5] Because Munguia's injury transpired on a platform almost identical to that at issue in Herb's Welding, any resort Munguia might have had to the first prong of the status test is necessarily foreclosed by that precedent.

We are left, therefore, with the functional test of maritime employment commended to us by the Court: Munguia's work will be deemed maritime "only if it is an integral or essential part of loading or unloading a vessel." Schwalb, 493 U.S. at 45. In Schwalb, of course, the Court extended the Act's coverage to "[s]omeone who repairs or maintains a piece of unloading equipment," id. at 47, but it reaffirmed the essential nexus to the loading and unloading processes.

IV.

---

[5] The Court relied for this result upon its earlier conclusion in Rodrigue v. Aetna Casualty & Sur. Co., 395 U.S. 352, 360 (1969), that fixed platforms are not vessels but are properly analogized to islands. Thus, an injury incurred while working thereon did not constitute an injury upon navigable waters and was not covered under the Act. See Gray, 470 U.S. at 416 n.2, 421-23.

The record evinces some confusion as to the precise duties Munguia was performing at the time of his injury. According to the ALJ,

> Claimant testified that he loaded and unloaded supplies from crew boats to tank batteries. The supplies Claimant said he unloaded were heavy equipment such as generators, motors, compressors, 500 pound drums of soap, chemicals and hay. Claimant said all the materials arrived only by boat and he would at times navigate the boat to other tank batteries. Claimant testified that no one else was specifically hired by Employer to load and unload equipment off and on the supply boats. Claimant also testified that he had to operate a crane at times to off-load equipment from the supply boats. Claimant testified that he spent 90% of his time working on the waterway and of that time, 50% of his time would be spent loading and unloading.

Apparently accepting Munguia's version of his employment activities, the ALJ found the status requirement satisfied, distinguishing Herb's Welding on the basis that "Claimant spent some of his time loading and unloading supplies from boats, in essence an action that the Act considers inherently maritime."[6]

The above-described activities Munguia testified to as part of his employment background with Chevron. Specifically, his testimony related to his specific duties as a roustabout (class "B"

---

[6] Although he found no fixed percentage of time that Munguia had spent loading and unloading supplies, the ALJ relied upon our adoption in two cases of the Caputo test to extend coverage to employees who "spend at least some of their time in indisputably longshoring operations." Caputo, 432 U.S. at 273. See also Howard v. Rebel Well Serv., 632 F.2d 1348, 1350 (5th Cir. 1980); Boudloche v. Howard Trucking Co., 632 F.2d 1346, 1347-48 (5th Cir. 1980), cert. denied, 452 U.S. 915 (1981). In Boudloche, we found coverage where the claimant spent only 2½% to 5% of his time in longshoring activities; in Howard, we held that the status requirement could be satisfied even though a claimant had spent less than 10% of his time in ship repair. Curiously, the ALJ also cited, as support, Thornton v. Brown & Root, Inc., 707 F.2d 149, 152-53 (5th Cir. 1983), cert. denied, 464 U.S. 1052 (1984), despite the fact that Thornton applied the too-expansive "realistically significant relationship to maritime employment" test expressly rejected in Herb's Welding, 470 U.S. at 418-19, 423.

7

and later, class "A") for Chevron from 1970, the start of his employment, to sometime in 1977, when, according to both his own testimony and that of his supervisor, James Burchfield, Munguia assumed the duties of a relief pumper-gauger. For approximately the last two and one-half years prior to his injury, then, Munguia was performing, as a relief pumper-gauger, functions quite different from those relied upon by the ALJ in finding coverage.

The ALJ's confusion in this respect compels our conclusion that substantial evidence did not support his factual findings and that they therefore are undeserving of the deference generally accorded such findings. In contrast to the ALJ's recitation, Munguia's duties as a relief pumper-gauger involved little or no loading and unloading of boats. Our previous consideration of Munguia's Jones Act appeal accurately described his activities:

> Each day Munguia was assigned to duty at various places in the field. If he was not assigned to work at the tank battery but to work on the various wells, Munguia took a boat, either alone or with another worker, and visited a number of the multiple small platforms within the field. He loaded onto the boat the tools and equipment he would need for the day and then navigated the boat to and from the various platforms. At each platform he unloaded the tools and equipment needed to do the work required at that platform. Approximately ninety percent of his time was spent either traveling to, or working on, the field platforms and other structures in the water.

Munguia, 768 F.2d at 651.

Additionally, there was testimony by Clement Malley, Chevron's production foreman for the South Pass field, that the tank batteries were supplied by three small contract crew boats (for small items) and two larger "lugger" boats, which operated three

8

days a week and delivered heavy equipment, drums of chemicals and soap, and hay (for soaking up small oil spills). Although Munguia claimed that, as a roustabout, he occasionally would help unload these boats, Malley testified that Chevron contracted with two different employers for crews to man these boats and perform the off-loading themselves.

As for the individual wells serviced by Munguia, customarily no heavy equipment was delivered to them. When working as a pumper-gauger, moreover, Munguia took to the wells only those tools and supplies he needed to perform his platform-related mission. Unlike the ALJ, we find little to distinguish this case from Herb's Welding. Like that of Mr. Gray, Munguia's work

> had nothing to do with the loading or unloading process, nor is there any indication that he was even employed in the maintenance of equipment used in such tasks. Gray's welding work was far removed from traditional LHWCA activities, notwithstanding the fact that he unloaded his own gear upon arriving at a platform by boat. He built and maintained pipelines and the platforms themselves. There is nothing inherently maritime about those tasks. They are also performed on land, and their nature is not significantly altered by the marine environment, particularly since exploration and development of the Continental Shelf are not themselves maritime commerce.

Herb's Welding, 470 U.S. at 425 (citations and footnotes omitted).

Munguia's testimony to the effect that small Jo-boats occasionally were used to carry small amounts of soap and chemicals between tank batteries does not alter our analysis. While loading and unloading of ships was undeniably required in order to complete these tasks, that fact alone does not warrant our concluding that Munguia thereby engaged in "maritime employment." As we have previously stated,

9

> the unloading and loading, and construction activities that the Court recognizes as the focus of the maritime employment test . . . can be unconnected with maritime commerce. . . . For example, an employee might unload one train, and load another; or an employee might engage in construction activities, but build an airplane instead of a ship. Nothing intrinsic in any of these activities established their maritime nature, rather it is that they are undertaken with respect to a ship or vessel. When the tasks are undertaken to enable a ship to engage in maritime commerce, then the activities become "maritime employment."

Fontenot, 923 F.2d at 1131 (footnotes omitted).

Because the transfer of small amounts of supplies between tank batteries by Munguia and his fellow roustabouts was undertaken )) like Gray's activities in Herb's Welding )) to further the non-maritime-related purpose of servicing and maintaining the fixed platform wells, the mere fact that Munguia may have loaded and unloaded them onto his skiff cannot confer coverage. Likewise, the incidental boat repairs performed by Chevron roustabouts )) even if considered a part of Munguia's pumper-gauger duties[7] )) were intended to further the maintenance of the wells, not the loading and unloading of cargo. Cf. Schwalb, 493 U.S. at 47 (extending coverage to employees injured "while maintaining or repairing equipment essential to the loading or unloading process" (emphasis added)).

In short, Munguia's daily activities as a pumper-gauger were intrinsically related to the servicing and maintenance of fixed

---

[7] Munguia was, on occasion, required to clean the boats and perform minor maintenance work such as changing wheels or propellers. The record reflects that Munguia spent only 5% to 6% of his working hours doing such maintenance work. On one occasion, he worked on the wire-line barge when it was being used to raise a sunken Jo-boat.

platform wells )) wells, moreover, almost indistinguishable from those built and maintained by Gray. Like Gray's welding activities, Munguia's tasks involve "nothing inherently maritime." Herb's Welding, 470 U.S. at 425. Any contact Munguia may have had with cargo was fleeting, unrelated to maritime commerce, and usually at a time by which these supplies no longer possessed the properties normally associated with "cargo." And as the Court has stated, "[w]e have never read `maritime employment' to extend so far beyond those actually involved in moving cargo between ship and land transportation." Id. at 424 (emphasis added).[8]

Because Munguia has failed to demonstrate that he was engaged in maritime employment when he was injured, he cannot meet the status requirement for coverage under the Act. We therefore do not address the question of situs, relied upon as dispositive by the

---

[8] "Cargo. The load (i.e. freight) of a vessel, train, truck, airplane or other carrier." BLACK'S LAW DICTIONARY 213 (6th ed. 1990). While we do not view the issue as dispositive, we discern in the Court's emphasis on the loading and unloading test for "maritime employment" at least an implicit requirement that what is loaded be "cargo." See, e.g., Ford, 444 U.S. at 84 (advancing a definition of maritime employment "that reaches any worker who moves cargo between ship and land transportation"); Caputo, 432 U.S. at 267 (describing the essential elements of unloading a vessel as "taking cargo out of the hold, moving it away from the ship's side, and carrying it immediately to a storage or holding area").

Thus, Munguia's transfer by boat of soap and chemicals from the tank batteries to the well platforms does not constitute the loading and unloading of cargo but rather the mere trans-shipment of supplies previously unloaded. The committee reports accompanying the Act's 1972 amendments are plain on this point:

> The Committee does not intend to cover employees who are not engaged in loading, unloading, repairing, or building a vessel, just because they are injured in an area adjoining navigable waters used for such activity. Thus, employees whose responsibility is only to pick up stored cargo for further trans-shipment would not be covered . . . .

Caputo, 432 U.S. at 266 n.27 (quoting S. REP. No. 1125, at 13; H. R. REP. No. 1441, at 10-11).

11

Board, but substitute our reasoning for that of the Board and AFFIRM.