**United States Court of Appeals**

**Fifth Circuit**

**F I L E D**

**May 18, 2004**

Charles R. Fulbruge III
Clerk

**IN THE UNITED STATES COURT OF APPEALS**

**FOR THE FIFTH CIRCUIT**

_____

No. 03-60131

_____

RANDALL THIBODEAUX,

Petitioner,

VERSUS

GRASSO PRODUCTION MANAGEMENT INC.; SIGNAL MUTUAL INDEMNITY
ASSOCIATION LIMITED, CARRIER; DIRECTOR, OFFICE OF WORKERS'
COMPENSATION PROGRAMS, U.S. DEPARTMENT OF LABOR,

Respondents.

_____

Petition for Review of
an Order of the Benefits Review Board

_____

Before JONES, MAGILL,* and SMITH, Circuit Judges.

MAGILL, Circuit Judge:

Randall Thibodeaux petitions for review of an order of the
Department of Labor Benefits Review Board ("Board") denying him
benefits under the Longshore and Harbor Workers' Compensation Act
("LHWCA"), 33 U.S.C. § 901, *et seq*. (2000).  Thibodeaux sought
compensation under the LHWCA after injuring himself while working
on a fixed oil production platform in the territorial waters of
Louisiana.  An administrative law judge held that Thibodeaux's

_____

*Circuit Judge of the United States Court of Appeals for the
Eighth Circuit, sitting by designation.

injury was covered by the LHWCA. The Board reversed, holding that the platform was not a covered situs under 33 U.S.C. § 903(a). We have jurisdiction pursuant to 33 U.S.C. § 921(c), and we deny the petition for review of the Board's order.

I.

During the relevant period, Thibodeaux worked for Grasso Production Management Inc. as a pumper/gauger on Garden Island Bay platform No. 276, a fixed oil and gas production platform. As part of his duties, Thibodeaux monitored gauges both on the platform and on nearby wells. He reached the wells by using a 17-foot skiff. In addition to the skiff, Thibodeaux also piloted a 24-foot vessel, the M/V Katie Elizabeth, which was used to transport employees from Venice, Louisiana, to the platform along with their personal supplies and, on occasion, equipment used for production. The platform where Thibodeaux spent the majority of his working hours rests on wooden pilings driven into a small bank next to a canal; the platform extends over marsh and water, but is accessible only by vessel. There are docking areas for the two water craft noted above.

Thibodeaux injured himself after observing that a discharge line located five feet below the deck of the platform was leaking oil. Upon determining that he could better inspect the line from a small wooden platform below the deck and adjacent to the line, he first lowered himself over the edge and then jumped the two to three remaining feet down onto the wooden platform. The wood gave

2

way, and Thibodeaux plunged into the marsh below where a nail pierced his hand. The accident did not occur on the portion of the platform used to dock the two vessels.

Thibodeaux filed a claim against Grasso and Signal Mutual Indemnity under the LHWCA. An ALJ held Thibodeaux was covered by the LHWCA as he was a maritime employee and his injury occurred on a pier, a situs enumerated in § 903(a). Grasso and Signal appealed to the Board. The Board reversed the ALJ, reasoning that the oil production platform was not a "pier" within the meaning of the statute. It did not reach the issue of status.

## II.

We review Board decisions for errors of law and to ensure the Board does not exceed its statutory authority to review whether an ALJ's findings of fact are supported by substantial evidence and consistent with the law. Cooper/T. Smith Stevedoring Co. v. Liuzza, 293 F.3d 741, 744 (5th Cir. 2002); Munquia v. Chevron U.S.A. Inc., 999 F.2d 808, 810 (5th Cir. 1993); see also 33 U.S.C. § 921(b)(3). The LHWCA provides remuneration for workers who establish that they were engaged in maritime employment[1] on a covered situs at the approximate time of their injuries. Munquia, 999 F.2d at 810. The situs requirement is satisfied where an

---

[1]Section 902(3) defines a covered employee, with some exceptions, as "any person engaged in maritime employment, including any longshoreman or other person engaged in longshoring operations, and any harbor-worker including a ship repairman, shipbuilder, and ship-breaker." 33 U.S.C. § 902(3).

3

injury occurs "upon the navigable waters of the United States (including any adjoining pier, wharf, dry dock, terminal, building way, marine railway, or other adjoining area customarily used by an employer in loading, unloading, repairing, dismantling, or building a vessel)." 33 U.S.C. § 903(a). The sole issue for our review is whether a fixed oil production platform built on pilings over marsh[2] and water and inaccessible from land constitutes either a "pier" or an "other adjoining area" within the meaning of § 903(a). We hold the platform in question is neither, and therefore deny the petition for review of the Board's ruling that Thibodeaux has not met the situs requirement of the LHWCA.

This court has previously adopted a functional approach to construing the parenthetically enumerated structures in § 903(a). Jacksonville Shipyards, Inc. v. Perdue, 539 F.2d 533, 541 (5th Cir. 1976), *vacated and remanded*, Pfeiffer Co., Inc. v. Ford, 433 U.S. 904 (1977), *reaffirmed*, 575 F.2d 79 (5th Cir. 1978), *cert. denied*, 440 U.S. 967 (1979), *overruled on other grounds*, Texports Stevedore Co. v. Winchester, 632 F.2d 504, 516 (5th Cir. 1980).[3] In Jacksonville Shipyards, we required an employee to demonstrate that

---

[2]The ALJ and Board apparently disagreed whether a portion of the platform was driven into dry land as opposed to marsh. Thibodeaux v. Grasso Prod. Mgmt., Inc., No. 02-0260 at 6 (BRB Dec. 17, 2002). Because we adhere to a functional approach to defining "pier," it is unnecessary for us to decide whether the platform was in fact secured to dry land or marsh, a determination that would likely change with the tide.

[3]Despite its troubled history, Jacksonville Shipyards remains controlling law on this proposition.

4

"a putative situs actually be used for loading, unloading, or one of the other functions specified in the Act." Id. In this way, we interpreted the statute not to encompass all possible instances of the enumerated structures, but rather only those with some relation to the purpose of the LHWCA—providing compensation for maritime workers injured in areas used for maritime work. Id. Under the reasoning of Jacksonville Shipyards, while a structure built on pilings and straddling both land and water may bear some physical resemblance to a pier, if it does not serve a maritime purpose, it is not a pier within the meaning of § 903(a). This position has been criticized; the ALJ in this case declined to follow Jacksonville Shipyards, instead employing the interpretation of pier first set forth in Hurston v. Dir., Office of Workers Comp. Programs, 989 F.2d 1547 (9th Cir. 1993), and later adopted by Fleischmann v. Dir., Office of Workers' Comp. Programs, 137 F.3d 131 (2d Cir. 1998). Thibodeaux v. Grasso Prod. Mgmt., Inc., No. 2001-LHC-1433 at 12 (ALJ Nov. 15, 2001). The Board in turn rejected the Hurston approach and set forth a functional analysis. We agree with the Board that the Hurston court's definition of pier is overly broad, and we instead adhere to the functional approach first announced in Jacksonville Shipyards.

In Hurston, the employee worked as a pile driver on a fixed oil production platform built on pilings extending from land to sea. Id. at 1548. Unlike the structure in this case, the platform at issue in Hurston was accessible from land. Id. at 1554 (quoting

5

findings of fact made by the ALJ) (Alarcon, J., dissenting).  In the course of holding that an oil production platform was a pier and therefore a covered situs, the Ninth Circuit eschewed the functional approach of <u>Jacksonville Shipyards</u>, instead holding that appearance wholly determined identity: "if it appears to be a pier, if it is built like a pier and adjoins navigable waters, it's a pier."  <u>Id.</u> at 1549.  The court rested its decision mainly on the fact that a close reading of § 903(a) reveals the enumerated term "pier" is not qualified by the phrase "customarily used by an employer in loading, unloading, repairing, dismantling, or building a vessel" as is the phrase "other adjoining area."  <u>Id.</u>  It reasoned that had Congress wanted to limit the meaning of the enumerated structures to its maritime connotation, it would have supplied a comma between "other adjoining area" and "customarily used," or otherwise explicitly stated its intention.  <u>Id.</u> at 1549-50.  Since Congress did not, the <u>Hurston</u> court assumed Congress must have intended "pier" to have its broadest meaning—any structure "built on pilings extending from land to navigable water."  <u>Id.</u> at 1553.  The Supreme Court, this circuit and the Eleventh Circuit have all expressly declined to resolve whether an enumerated structure such as a pier or a wharf need also be "customarily used by an employer in loading, unloading, repairing, dismantling, or building a vessel."  <u>Northeast Marine Terminal Co. v. Caputo</u>, 432 U.S. 249, 280 (1977); <u>Texports Stevedore Co. v.</u>

6

<u>Winchester</u>, 632 F.2d 504, 511-12 n.11 (5th Cir. 1980) (en banc)[4];

<u>Brooker v. Durocher Dock & Dredge</u>, 133 F.3d 1390, 1394 (11th Cir.

1998) ("We, like the Supreme Court in *Caputo* and the former Fifth

Circuit in <u>Winchester</u>, need not reach the issue of whether a pier

must be 'customarily used' for vessel activity to meet the situs

test in section 3(a) of the LHWCA.").

Even assuming the <u>Hurston</u> court is correct in its grammatical

reading of § 903(a), its conclusion does not follow from its

premise.  To hold as a matter of grammar and punctuation that the

phrase beginning "customarily used" does not modify "pier" is quite

different from holding as a matter of law that the term "pier"

derives no meaning from its context in a maritime statute, and that

the term's statutory meaning extends to the outer limits of its

---

[4]In <u>Winchester</u>, this court noted possible tension between <u>Caputo</u> and <u>Jacksonville Shipyards</u>:"[t]he [Jacksonville Shipyards] panel indicated that all sites must be customarily used for maritime purposes, but the Supreme Court has expressed doubt over whether the 'customarily used' language applies to the seven specific sites as well as the general one."  632 F.2d at 511-12 n.11.  However, the <u>Winchester</u> court specifically declined to resolve the issue, as that case required application of the "other adjoining areas" category rather than an enumerated site.  Nor did the Supreme Court in <u>Caputo</u> resolve the broader question of whether the enumerated sites should be defined functionally.  At best, that Court cast doubt on whether, as a matter of grammar, the phrase beginning "customarily used" modified the enumerated sites.  It did not hold that a structure similar to an enumerated site in appearance need serve no maritime purpose to come within § 903(a). To the contrary, the Court noted the situs at issue in <u>Caputo</u> was used for loading and unloading.  432 U.S. at 281.  As we explain below, our opinion today does not rest on reading the phrase "customarily used by an employer in loading [or] unloading" to modify "pier" as a matter of grammar.  Rather, we hold the context of the statute indicates the enumerated sites should have some maritime purpose.

meaning in ordinary language.

The Board in the present case aptly described <u>Hurston</u>'s error in this regard:

> While the Board acknowledged in <u>Hurston</u> that the sites enumerated in Section 3(a) need not be shown to be customarily used for loading, unloading, building or repairing vessels, in contrast to the general "other adjoining areas" covered by the Act, it does not follow that such a site is covered based solely on appearance where it clearly lacks a maritime purpose. The sites enumerated in Section 3(a) are all land-based structures or areas which adjoin navigable waters and are typically used in maritime activities. An enumerated site, like a pier or dry dock, is thus covered without the need for specific proof that the site in fact has a maritime use. Where, however, the record does contain evidence that a site does not serve a maritime function, the fact that it may look similar to a pier cannot control. . . . The mere fact that the platform is located over water cannot alter the fact that its use as a drilling facility is a non-maritime use.

<u>Thibodeaux v. Grasso Prod. Mgmt., Inc.</u>, No. 02-0260 at 6-7 (BRB Dec. 17, 2002).

We agree with the Board that we need not read the phrase "customarily used" as modifying "pier" in order to arrive at the conclusion that the term "pier" in § 903(a) does not include every conceivable structure built on pilings over land and water, but rather only those serving some maritime purpose.

The maritime nature of the LHWCA imparts a meaning to § 903(a)'s enumerated terms that goes beyond their use in ordinary language. Congress enacted the LHWCA pursuant to its maritime jurisdiction, having been twice rebuffed by the Supreme Court in its initial attempts to use state workers' compensation laws to

8

cover injuries occurring in navigable waters.  <u>Calbeck v. Travelers Ins. Co.</u>, 370 U.S. 114, 117 (1962) (holding that Congress invoked its constitutional maritime power in enacting the LHWCA in 1927); <u>Knickerbocker Ice Co. v. Stewart</u>, 253 U.S. 149 (1920) (invalidating pre-1927 legislation delegating to states the power to legislate maritime workers' compensation laws); <u>Washington v. W.C. Dawson & Co.</u>, 264 U.S. 219 (1924) (same).  The LHWCA provides only for employees "engaged in maritime employment" who work either on or near navigable waters.  33 U.S.C. § 902(3).  In light of the statute's origin and aim, it would be incongruous to extend it to cover accidents on structures serving no maritime purpose.

Moreover, the terms enumerated in § 903(a) which accompany pier—wharf, dry dock, terminal, building way, and marine railway—connote maritime commerce.  <u>Hurston</u>, 989 F.2d at 1558 (Alacron, J., dissenting).  The canon *noscitur a sociis*, "a word is known by the company it keeps," is "often wisely applied where a word is capable of many meanings in order to avoid the giving of unintended breadth to the Acts of Congress."  <u>Hickman v. Texas</u>, 260 F.3d 400, 403 (5th Cir. 2001) (quotations omitted).  The approach adopted by the ALJ and the <u>Hurston</u> court results in just such an overly broad interpretation of the term "pier."  The <u>Hurston</u> court acknowledged that its minimalist definition of structures enumerated in § 903(a) could include, in addition to oil production platforms, "offices, homes, restaurants, retail outlets, and parking lots" built on foundations that resemble piers or wharves.  989 F.2d at 1553.  If

9

the enumerated terms are considered in isolation, and only their most basic attributes extracted from definitions, then perhaps they could stretch so far as to include homes and parking lots. But when viewed together in the context of the LHWCA, a connection to maritime commerce becomes the unifying thread connecting the listed structures.[5] See Hickman, 260 F.3d at 403 ("'[I]n expounding a statute, we must not be guided by a single sentence or member of a sentence, but look to the provisions of the whole law, and to its object and policy.'") (quoting Kelly v. Robinson, 479 U.S. 36, 43 (1986)).

It is contrary to sound statutory construction to impute an intent to Congress that "pier" be defined in such a way as to include structures having no connection to maritime activity, where the term is contained in a statute enacted pursuant to Congress's maritime jurisdiction and for the benefit of maritime employees, and is placed in a list of structures with obvious maritime connotations.

---

[5]Additionally, we note that in context the word "other" in the phrase "or *other* adjoining area customarily used by an employer in loading [or] unloading" (emphasis added) means something to the effect of "additional," and necessarily refers back to the enumerated structures, indicating that what follows will have some resemblance to what preceded. It is reasonable to surmise that Congress intended for the additional unspecified "adjoining areas" to have qualities similar to those possessed by the enumerated structures, such as being used for a maritime purpose. Thus the similarity between the enumerated structures and any qualifying structure in the catch-all "other adjoining area" category is that structures in both categories customarily are used for a maritime purpose such as loading and unloading vessels.

The <u>Hurston</u> court attempted to buoy its definition of "pier" by sinking into the long history of the LHWCA. The court concluded:

> Since 1972, the LHWCA has emphasized status over situs to avoid the anomaly of a worker walking in and out of coverage. It would be counter to the history of the statute now to restrict the situs requirement to only those piers with "maritime use": a maritime employee injured on a pier which is not used for a maritime purpose would continually "walk in and out" of coverage, as did all longshoremen before 1972.

989 F.2d at 1551; <u>see, e.g.</u>, <u>Chesapeake & Ohio R.R. Co. v. Schwalb</u>, 493 U.S. 40, 46 (1989) (stating that prior to the 1972 amendment adding the enumerated structures, maritime workers loading or unloading a vessel were covered if an injury occurred on the vessel or gangplank, but not on a wharf or pier). However, we do not resurrect that evil by holding that fixed oil production platforms are not piers. Workers on oil platforms would not walk in and out of coverage like workers unloading vessels prior to 1972; rather, oil platform workers like Thibodeaux would, for the vast majority of their working hours, simply be outside of coverage of the LHWCA, just like oil production workers on land-based drilling operations. The Supreme Court has rejected the argument that coverage must be extended to workers on oil production platforms in order to avoid recreating the problem Congress attempted to resolve in 1972. <u>Herb's Welding, Inc. v. Gray</u>, 470 U.S. 414, 427 n.13 (1985). Like the worker in <u>Herb's Welding</u>, Thibodeaux "is a far cry from the paradigmatic longshoreman who walked in and out of coverage during

11

his workday and spent substantial amounts of his time 'on navigable waters.'" Id. The Ninth Circuit has previously recognized this very point. Williams v. Dir., Office of Workers Comp. Programs, 825 F.2d 246, 247 (9th Cir. 1987) (stating that the anomaly of walking in and out of coverage is not present when work is being performed in an area with "no functional relationship to maritime activity").

The Board's decision is further strengthened by the fact that the Supreme Court has twice considered fixed oil production platforms to be islands. Herb's Welding, 470 U.S. at 422 n.6; Rodrigue v. Aetna Casualty & Surety Co., 395 U.S. 352, 360 (1969). In Rodrigue, the Court held that fixed drilling rigs located on the outer Continental Shelf off the Louisiana coast were artificial islands. 395 U.S. at 359-60. Though Rodrigue concerned admiralty jurisdiction over tort claims arising from accidents on fixed oil drilling platforms and not whether such rigs meet the situs requirement of the LHWCA, Rodrigue's appellation was approved in Herb's Welding, which did concern the post-1972 amended LHWCA. 470 U.S. at 421-22.

In Herb's Welding, the Supreme Court reviewed a decision by this court affirming benefits under the LHWCA for an employee injured while welding on a fixed oil production platform in Louisiana waters. Herb's Welding, Inc. v. Gray, 703 F.2d 176 (5th Cir. 1983). This court based its situs determination on language in Rodrigue likening oil production platforms to wharves. Id. at

12

177-78.[6]  The Fifth Circuit noted that at the time Rodrigue was decided, wharves where not covered sites under the LHWCA.  Id. Since after Rodrigue the statute was amended to extend to wharves and piers, this court reasoned that the Rodrigue court's analogy provided a sufficient foundation to hold that fixed oil production platforms could satisfy § 903(a) because they are like wharves in that they are customarily used in loading and unloading crews, supplies, and oil.  Id. at 178.  The Supreme Court reversed. While it limited its decision to status rather than situs, the Court reaffirmed Rodrigue's classification of fixed oil production platforms as islands, stating in response to the dissent's likening of a production platform to a pier that "while Rodrigue did observe that offshore platforms are *like* piers, its holding was that they *are* islands.  It has not been suggested that workers on islands are covered by the LHWCA."  470 U.S. at 422 n.6 (internal citation omitted).   Herb's Welding's insistence that oil production platforms be considered islands even outside of the narrow issue of admiralty jurisdiction, together with the statutory analysis above, provides ample support for holding that the oil production platform at issue in this case is not a pier, even though it may possess a few of the basic physical attributes of a pier.

Nor should a court rely more heavily on the requirement of

---

[6]Though not discussed in the Fifth Circuit's decision in Herb's Welding, Rodrigue likened production platforms to piers as well as wharves.  395 U.S. at 360.

status to circumscribe the outer limits of coverage under the LHWCA where an enumerated situs is at play. Situs and status play equal, coordinate roles in determining coverage. As then-Judge Kennedy wrote:

> Situs and status must coincide before coverage will attach. Each test acts as a control upon the other so as to diminish the potential for undue expansion of coverage. . . . [B]y operating coordinately, the status and situs tests fix coverage within somewhat more certain bounds than would be the case under either test alone.

Brady-Hamilton Stevedore Co. v. Herron, 568 F.2d 137, 140 (9th Cir. 1978).

### III.

Having resolved to require that in order to be a pier within the meaning of the LHWCA a structure must have some maritime purpose, we conclude that the oil production platform where Thibodeaux worked does not meet that standard. Both this court and the Supreme Court have expressed the opinion that work commonly performed on oil production platforms is not maritime in nature. Munquia v. Chevron U.S.A. Inc., 999 F.2d 808, 818 (5th Cir. 1993); Herb's Welding, 470 U.S. at 423-24.

Munquia involved a case quite similar to the present one, though we ultimately resolved it on the basis of status. The employee in Munquia was also a pumper/gauger working on fixed oil production platforms built over marsh and water and accessible only by water. 999 F.2d at 809. Just as in this case, the employer maintained vessels at the platforms in order to serve the needs of

14

production.  Id. at 810.  Even though the platforms were accessed by boat, we held that the use of boats for servicing and maintaining production facilities was not in furtherance of a maritime purpose.  Id. at 812-13.  Munquia relied heavily on Herb's Welding, where the Supreme Court held that a welder on a fixed oil production platform was not a maritime employee within the LHWCA.  In the course of its analysis, the Court examined work normally performed on oil production platforms.  As for building and maintaining platforms and pipelines, it concluded that "[t]here is nothing inherently maritime about those tasks.  They are also performed on land, and their nature is not significantly altered by the marine environment, *particularly since exploration and development of the Continental Shelf are not themselves maritime commerce*."  470 U.S. at 425 (emphasis added).  While both Munquia and Herb's Welding are status cases, their description of the work performed on fixed oil production platforms as non-maritime is highly relevant to the issue of whether the oil production platform in this case has a connection to maritime commerce.  Against the backdrop of Munquia and Herb's Welding, Thibodeaux has pointed to no connection Garden Island Bay platform No. 276 has with maritime commerce that distinguishes it from the platforms in those cases.[7]  Oil is not shipped from the platform.  Although personal gear and

---

[7]The platforms at issue in Munquia were actually serviced by a fleet much larger than the one here.  999 F.2d at 810 (stating that eight to twelve small vessels and at least one large vessel were used to service the production field).

15

occasionally supplies are unloaded at docking areas on the platform, the purpose of the platform is to further drilling for oil and gas, which is not a maritime purpose.

IV.

Finally, the Board also determined that Thibodeaux's injury did not occur on an "other adjoining area customarily used by an employer in loading, unloading, repairing, dismantling, or building a vessel." 33 U.S.C. § 903(a). We assume that the area of injury—a platform and marsh a short distance away from navigable water—qualifies as an "adjoining area." However, an adjoining area must be "customarily used for significant maritime activity." Texports Stevedore Co. v. Winchester, 632 F.2d 504, 515 (5th Cir. 1980) (en banc). Even if we define the "area" of injury broadly as the entire production platform rather than the adjacent small wooden platform from which Thibodeaux actually fell, the analysis above demonstrates that under Munquia and Herb's Welding, an oil production platform is normally not the site of significant maritime activity. See id. at 516 (reasoning that "area" should be broadly construed). Nor does the record in this case indicate that the platform at issue here is different from the platforms in those cases in a meaningful way.

V.

For the foregoing reasons, we deny the petition for review of the Board's decision holding Thibodeaux has not met the situs requirement of 33 U.S.C. § 903(a).

16