**REVISED OCTOBER 10, 2013**

# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

October 8, 2013

No. 12-60289

Lyle W. Cayce
Clerk

BPU MANAGEMENT, INCORPORATED/SHERWIN ALUMINA COMPANY;
LIBERTY MUTUAL INSURANCE COMPANY,

Petitioners

v.

DIRECTOR, OFFICE OF WORKERS' COMPENSATION PROGRAMS,
UNITED STATES DEPARTMENT OF LABOR; DAVID MARTIN,

Respondents

Petition for Review of an Order
of the Benefits Review Board

Before DAVIS and JONES, Circuit Judges, and MILAZZO[*], District Judge.

W. EUGENE DAVIS, Circuit Judge:

Petitioner BPU Management Inc./Sherwin Alumina Co. ("Sherwin") employed Respondent David Martin ("Martin") as a dockworker at its waterside ore processing facility. When Martin was injured in one of the facility's underground ore transport tunnels, the Benefits Review Board ("BRB") ordered Sherwin to pay Martin benefits under the Longshore and Harbor Workers' Compensation Act ("LHWCA" or "the Act"). Because we conclude that the

---

[*] District Judge of the Eastern District of Louisiana, sitting by designation.

No. 12-60289

underground transport tunnel where Martin was injured is not used in the vessel-unloading process, Martin's injury did not occur on a LHWCA-covered situs. We therefore GRANT Sherwin's Petition for Review of the BRB's decision, and REMAND to the BRB to dismiss Martin's claim.

I.

Sherwin operates an alumina processing facility on the Texas Gulf Coast, the primary purpose of which is the production of industrial alumina from raw bauxite.[**] Like many industrial production sites, Sherwin's alumina facility is situated along a navigable waterway so that vessels can easily unload feedstock materials and load finished product.

Because Sherwin's facility includes both its manufacturing and its loading/unloading operations. Bauxite unloaded from ships is moved directly into the alumina production process. Sherwin's operation begins when raw bauxite is unloaded from vessels at docks in Sherwin's deep water port using an "overhead conveyor system." The overhead conveyor system carries the bauxite over a street and fence separating the dock area from the alumina processing facility. There the conveyor deposits the bauxite into one of several dozen "bins" located in a large covered storage area. The bauxite remains in the storage area until it is needed; this varies from a few weeks to a period of years. Once a particular grade of bauxite is selected for alumina extraction, a small gate located in the floor beneath the appropriate bin or pile is opened to drain the bauxite into a large, underground "reclaim system." There the bauxite is mechanically sifted through a "screw feeder," which breaks down the bauxite into smaller pieces and deposits it on the "reclaim conveyor belt." From there, the reclaim conveyor belt transports and drops the bauxite onto the "cross-tunnel conveyor." In turn, the cross-tunnel conveyor transports the selected bauxite to

---

[**] Bauxite is the principal ore of aluminum.

No. 12-60289

the "rod mill," where it is further pulverized as part of the manufacturing process.[***] In the course of conveyor belt transport, bauxite often spills off the cross-tunnel conveyor onto the floor and must occasionally be shoveled back onto the conveyor.

From 1997 to 2006, Sherwin employed David Martin as a dockworker. Though Martin's primary duty was to ensure that ships were properly docked and loaded or unloaded, he ordinarily spent several hours each month cleaning the cross-tunnel of debris. On February 15, 2006, Martin was in the cross-tunnel shoveling fallen bauxite back onto the conveyor when he injured his lower back.

Martin was allegedly unable to return to his job with Sherwin and filed a claim seeking benefits under the LHWCA. At the benefits hearing, the ALJ concluded that the cross-tunnel where Martin was injured is a LHWCA-covered situs because it is "linked to buildings where vessels were loaded and unloaded." As such, the ALJ found that Sherwin was responsible to Martin for benefits under the LHWCA.

Sherwin appealed the ALJ's order to the BRB, arguing that the cross-tunnel is not a LHWCA-covered situs. However, the BRB rejected Sherwin's argument, reasoning that the cross-tunnel has a substantial nexus with the bauxite-unloading process. Because the cross-tunnel is underneath the storage area, which adjoins and has a "functional relationship with navigable waters," the BRB concluded that it is a LHWCA-covered situs. Accordingly, the BRB affirmed the ALJ's decision, and Sherwin now petitions for review.

II.

---

[***] Once the manufacturing process is completed, the alumina is sent by a separate series of conveyor belts to alumina silos, then to the dock, and finally to a loading tower.

No. 12-60289

We conduct a de novo review of the BRB's legal conclusions.[****] The question of LHWCA situs is ordinarily a mixed question of law and fact.[*****] "However, where, as in this case, the facts are not in dispute, '[LHWCA] coverage is an issue of statutory construction and legislative intent,' and should be reviewed as a pure question of law."[******]

## III.

The sole question we must decide in this case is whether the cross-tunnel where Martin was injured is a covered situs under the LHWCA.

The LHWCA extends coverage to employees only if their injury occurred on a covered situs. This situs is defined in 33 U.S.C. § 903(a), and extends coverage to "injur[ies] occurring upon the navigable waters of the United States (including any adjoining pier, wharf, dry dock, terminal, building way, marine railway, or other adjoining area customarily used by an employer in loading, unloading, repairing, dismantling, or building a vessel)." In the instant case, Martin's injury did not occur on navigable waters or in one of the LHWCA's enumerated areas. Therefore, Martin's injury only satisfies the situs requirement if he shows his injury occurred in an "other adjoining area customarily used by an employer in loading[ or] unloading . . . a vessel."[*******]

In a recent en banc decision of this court, *New Orleans Depot Services, Inc. v. DOWCP*, we explained precisely what the LHWCA's other-adjoining-area situs provision requires: "[A]n 'other adjoining area' must satisfy two distinct situs components: (1) a geographic component (the area must adjoin navigable

---

[****] *Andrepont v. Murphy Exploration & Prod. Co.*, 566 F.3d 415, 417 (5th Cir. 2009).

[*****] *New Orleans Depot Servs., Inc. v. DOWCP*, 718 F.3d 384, 387 (5th Cir. 2013) (en banc).

[******] *Id.* (quoting *DOWCP v. Perini North River Assocs.*, 459 U.S. 297, 300, 305 (1983)).

[*******] *See id.* It is undisputed that Sherwin's facility is not used for "repairing, dismantling, or building a vessel." *See* 33 U.S.C. § 903(a).

No. 12-60289

waters) and (2) a functional component (the area must be 'customarily used by an employer in loading [or] unloading . . . a vessel')."********

A.

Turning first to the geographic component of the situs test, the LHWCA only covers injuries in an area which "adjoins" navigable waters.********* In *New Orleans Depot*, we specifically rejected a broad definition of "adjoins" and found that the word should be given its ordinary meaning: "contiguous with" or "abutting upon."********** Therefore, an area is only adjoining navigable waters—and within the reach of the LHWCA—if it borders on or is contiguous with navigable waters.********** Here, the employer's entire facility including the location where Martin was injured adjoins navigable water. Martin has therefore satisfied the geographic prong of the situs test.

B.

Proceeding to the functional prong, the situs of Martin's injury is only a LHWCA-covered "other adjoining area" if it is "customarily used" for unloading vessels.*********** To satisfy the situs inquiry's functional prong, the site of the injury need not be "exclusively" or "predominantly" used for unloading—only customarily.************ Moreover, we look to the general purpose of the area rather

---

******** 718 F.3d at 389–90 (quoting 33 U.S.C. § 903(a)).

******** *See* 33 U.S.C. § 903(a).

********* *See* 718 F.3d at 390–94.

********** *Id.*

*********** *See* 33 U.S.C. § 903(a). No one alleges that Sherwin's facility is used for any of the LHWCA's other enumerated activities: vessel loading, repair, construction, or dismantling.

************ *See Coastal Prod. Servs., Inc. v. Hudson*, 555 F.3d 426, 435 (5th Cir. 2009).

No. 12-60289

than requiring "every square inch of an area" to be used for a maritime activity.*************

In the instant case, the BRB concluded that the cross-tunnel where Martin suffered his injury is used in the unloading process and therefore has a functional relationship with navigable waters. According to the BRB, the surface storage buildings above the cross-tunnel are connected to the docks by conveyor belts and are therefore a part of Sherwin's unloading process. Because the storage buildings are used in unloading bauxite and do not house manufacturing facilities, the BRB reasoned that the cross-tunnels beneath the buildings are necessarily involved in the unloading process.

However, the BRB's analysis mischaracterizes the nature of the cross-tunnels and their connection to the unloading process. Specifically, the fact that surface-level storage buildings are connected to the unloading process does not automatically render everything above and below the buildings a part of the unloading process. Such a generalization ignores the operational realities of a sophisticated multi-tier facility and arbitrarily attributes to one distinct area the functions of another. Moreover, the correct question is not whether Sherwin's cross-tunnels are used for manufacturing, but whether the cross-tunnels are customarily used for unloading a vessel. If the tunnels are not used for unloading a vessel, then Martin's injury did not occur in a LHWCA-covered situs.

As this court has previously recognized, "the primary purpose of . . . loading and unloading [is] to get cargo on or off the [vessel]."************** Moreover,

---

************** *See id.* The LHWCA situs inquiry is not "a game of hopscotch" in which "[t]he bathrooms in an otherwise 'adjoining area' would not be covered, [or the] pavement that although clearly within the area, had not been walked on by stevedores loading and unloading a vessel."

************** *Owens v. SeaRiver Maritime, Inc.*, 272 F.3d 698, 704 (5th Cir. 2001).

No. 12-60289

the mere act of loading, unloading, moving, or transporting something is not enough: "Nothing intrinsic in any of these activities establishes their maritime nature, rather it is that they are undertaken with respect to a ship or vessel."[**************] Thus, "the essential elements of unloading a vessel" are "taking cargo out of the hold, moving it away from the ship's side, and carrying it immediately to a storage or holding area."[**************] Although maritime unloading necessarily requires some nexus with a vessel, the Supreme Court has rejected a definition of unloading which stops the moment a vessel's cargo is unloaded onto the dock.[**************]

Several courts have considered the extent to which an activity is part of the vessel-unloading process. In *Chesapeake & Ohio Ry. Co. v. Schwalb*, the Supreme Court determined that where a conveyor belt is used to load coal onto a ship, employees who clean up fallen coal beneath the conveyor are involved in the unloading process.[**************] Because the unloading operations would soon cease if the loading area was not maintained, the Court reasoned that such employees are "essential to the loading . . . process."[**************]

Martin argues that *Schwalb* controls here, but the facts of the instant case are distinguishable from *Schwalb* because as we explain below, Martin was not injured while participating in unloading a vessel or conduct essential to that activity. At least two decisions from other circuits involving facts similar to the

---

[**************] *Fontenot v. AWI, Inc.*, 923 F.2d 1127, 1131 (5th Cir. 1991). *See also Herb's Welding, Inc. v. Gray*, 470 U.S. 414, 424 (1985) ("We have never read 'maritime employment' to extend so far beyond those *actually involved* in moving cargo between ship and land transportation.") (emphasis added).

[**************] *Northeast Marine Terminal Co., Inc. v. Caputo*, 432 U.S. 249, 267 (1977).

[**************] *See id.* at 266–67.

[**************] 493 U.S. 40, 47 (1989).

[**************] *Id.*

No. 12-60289

instant case demonstrate why *Schwalb* does not control. The Eleventh Circuit, in *Bianco v. Georgia Pacific Corp.,* found that the portions of a large riverside industrial gypsum facility used for bagging gypsum and slicing sheetrock were not related to the facility's vessel-unloading activities.*************** *Bianco* involved a multi-stage process for unloading and production comparable to the instant case.*************** First, raw gypsum was unloaded from the ship by a conveyor belt into a hopper.*************** Then, a second conveyer belt carried the gypsum to a Transfer House, where it proceeded to a third conveyor belt to be poured into a rock shed.*************** The gypsum would remain in storage inside the rock shed until it was needed for the production of sheet-rock or gypcrete.*************** When it was needed for production, the gypsum would be "crushed, screened, [and] baked" before it was sent to a production department.*************** The employee suffered two injuries in the sheet-rock production department of the facility.*************** The court held that, it was inappropriate to find that the employer's entire facility was an "adjoining area," irrespective of the activities occurring in different areas. The court reasoned that it "would effectively be writing out of the statute the requirement that the adjoining area be 'customarily used by an employer in loading, unloading, repairing, dismantling, or building a vessel.'"***************

---

*************** 304 F.3d 1053, 1058 (11th Cir. 2002).

*************** *See id.* at 1053.

*************** *Id.*

*************** *Id.*

*************** *Id.*

*************** *Id.*

*************** *Id.*

*************** *Id.* at 1060 (internal citations omitted).

No. 12-60289

Another case, perhaps even closer to the facts of today's case, the Eighth Circuit considered whether part of an industrial coal-loading facility—whose entire purpose was to load coal onto vessels—was customarily used in the loading process.\*\*\*\*\*\*\*\*\*\*\*\*\*\* Specifically, an employee sought LHWCA benefits after being injured in an area that temporarily stored loaded coal cars before they were released down an incline to the ship-loading conveyor.\*\*\*\*\*\*\*\*\*\*\*\*\*\* The employee's job duties were limited to placing the cars in the Barney Yard and setting their handbrakes to secure them in place.\*\*\*\*\*\*\*\*\*\*\*\*\*\* After the cars were secured, a separate crew would release them to be sent down an incline where the coal was loaded.\*\*\*\*\*\*\*\*\*\*\*\*\*\* Reasoning that the loading process did not begin until the coal cars were identified and released towards the area where coal was physically loaded, the court concluded that the car storage area was not customarily used in the loading process.\*\*\*\*\*\*\*\*\*\*\*\*\*\*

The Supreme Court has not provided a firm definition of unloading in this context, but its decision in *P.C. Pfeiffer Co. v. Ford* provides the most guidance.\*\*\*\*\*\*\*\*\*\*\*\*\*\* Specifically, the *P.C. Pfeiffer* Court was concerned with whether two workers were involved in unloading vessels and thereby engaged in "maritime employment."\*\*\*\*\*\*\*\*\*\*\*\*\*\* The Court reasoned that the traditional longshoreman's job was only to "transfer[] goods between ship and land transportation," the Court concluded that anyone participating in this unloading

---

\*\*\*\*\*\*\*\*\*\*\*\*\*\* *See In re Norfolk Southern Ry. Co.*, 592 F.3d 907, 914 (8th Cir. 2010).

\*\*\*\*\*\*\*\*\*\*\*\*\*\* *Id.*

\*\*\*\*\*\*\*\*\*\*\*\*\*\* *Id.* at 910.

\*\*\*\*\*\*\*\*\*\*\*\*\*\* *Id.* at 914.

\*\*\*\*\*\*\*\*\*\*\*\*\*\* *See id.*

\*\*\*\*\*\*\*\*\*\*\*\*\*\* 444 U.S. 69, 79–80 (1979).

\*\*\*\*\*\*\*\*\*\*\*\*\*\* *Id.* at 77–82.

9

process was engaged in maritime employment.*************** In determining the point at which the unloading process had been completed, the Court's line was clear: the LHWCA covers all of the unloading activities in the chain of transferring cargo from vessel to land transport, but it does not cover the activities of a person whose "responsibility is only to pick up stored cargo for further trans-shipment."*************** The employees in *Pfieffer* were both injured while preparing cargo for further transport.*************** The first employee, Diverson Ford, injured a finger on his left hand as he fastened military vehicles onto railroad flatcars for land shipment; the second employee, Will Bryant, was injured while unloading a bale of cotton into a pier warehouse, where it would later be moved out of the warehouse to a ship for transportation.*************** The Court held that both men were injured before the cargo had been surrendered for land transport—before the unloading process had been completed.

The *P.C. Pfeiffer* Court's rationale suggests a clear rule in the usual case where cargo is unloaded for ultimate shipment over land: Vessel-unloading includes the transfer of cargo from ship to shore only until it is surrendered for land transport. Because a shoreside industrial facility such as Sherwin's does not utilize any land transport, we must determine what part of Sherwin's bauxite intake process is the appropriate analog for the surrender of cargo to land transport.

We read *Pfeiffer* to hold that the surrender of cargo for land transport marks the end of the maritime unloading process because it is the point where

---

*************** *Id*. at 80–82.

*************** *Id*. at 83.

*************** *Id*. at 71–72.

*************** *Id*.

the longshoreman's duty to unload and move the cargo ceases.[**************]   Not coincidentally, the point of surrender is also the point at which the receiving party takes responsibility for the cargo.[**************] In the instant case, the point at which Sherwin's dock employees cease moving bauxite and deposit it for another "party" to retrieve is when the bauxite is delivered into the storage area. Once the ore is deposited into storage, it is Sherwin's engineering employees who manage and control the bauxite's further movement. Because Sherwin's dock employees no longer exercise control over bauxite in storage, the delivery of bauxite into storage is the functional equivalent of the surrender of cargo for land transport.

The operational layout of Sherwin's bauxite processing system reinforces the conclusion that the vessel-unloading process is complete long before bauxite reaches the cross-tunnels. Although incoming bauxite is deposited on top of the bauxite stockpiles, bauxite used in production is extracted from the *bottom* of the stockpiles. Therefore, because Sherwin stockpiles bauxite for periods of months and years, it would be inaccurate to describe this stored bauxite as a mere step in the vessel-unloading process. Also relevant is the fact that the alumina manufacturing process begins—which would suggest any vessel-unloading is finished—the instant bauxite is funneled from the stockpiles into the reclaim system. In fact, bauxite only enters the cross-tunnel where Martin was injured after it sits in a long-term storage stockpile, migrates to the bottom of its respective ore pile, is specifically selected by Sherwin's process engineers for production, is crushed in the screw feeder, and is finally transported towards the

---

[**************] *See id*. at 79–84.

[**************] *See id.*

metal-extraction facility. Ore at this stage is clearly no longer being "unloaded" from a vessel in any sense of the word.***************

Martin responds by insisting that shoveling ore debris in the cross-tunnel is part of unloading because it is "essential to the [un]loading . . . process."*************** Specifically, Martin contends that if the cross-tunnel area was not routinely cleaned of debris, the cross-tunnel would theoretically fill up with ore, the conveyor would have to be shut down, the stockpile areas would eventually fill up, and no more ore could be unloaded from vessels. While unloading does embrace those activities on which the unloading process directly depends—such as cleaning the unloading area and maintaining the unloading equipment—this is not one of those areas. The record indicates that an extraordinary amount of additional bauxite could be deposited in outdoor storage before unloading would have to cease.*************** Cleaning an area so far removed from any unloading operations is not "integral to the unloading process."***************

Because the delivery of shipped cargo into Sherwin's storage area is the functional equivalent of surrendering the cargo to a receiving land carrier, we conclude that this is where the vessel-unloading process ends. Thus, we hold

---

*************** *See Sidwell v. Va. Int'l Terminals, Inc.*, 372 F.3d 238, 244 (4th Cir. 2004) ("The LHWCA requires a direct and immediate role in the loading or unloading process."); *see also Bianco*, 304 F.3d at 1058 ("'Here, the . . . production plant was not an 'area' used either exclusively, or even customarily, for a maritime purpose or for significant maritime activity."); *In re Norfolk Southern Ry. Co.*, 592 F.3d 901. Note also that because a longshoreman involved in unloading ore at Sherwin's dock is not required to enter and exit the cross-tunnels, the LHWCA's concern for shifting coverage does not apply here.

*************** *See Schwalb*, 493 U.S. at 47.

*************** Specifically, uncontradicted testimony established that Sherwin's additional storage areas could accommodate more than a million tons of bauxite ore, while those storage areas only contained about a quarter of a million tons of ore at the time of the formal hearing.

*************** *See Schwalb*, 493 U.S. at 47.

No. 12-60289

that Sherwin's underground cross-tunnels are not customarily used for unloading vessels and do not satisfy the LHWCA's functional prong. Accordingly, Martin fails to satisfy the LHWCA's situs test.

IV.

For the reasons stated above, the Petition for Review is granted and the case is remanded to the BRB to enter an order dismissing Martin's claim for benefits under the LHWCA.

PETITION GRANTED and REMANDED.