# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

No. 18-60542

United States Court of Appeals
Fifth Circuit

**FILED**
July 22, 2019

Lyle W. Cayce
Clerk

WOOD GROUP PRODUCTION SERVICES,

> Petitioner

v.

DIRECTOR, OFFICE OF WORKERS' COMPENSATION PROGRAMS,
UNITED STATES DEPARTMENT OF LABOR; LUIGI A. MALTA,

> Respondents

Petition for Review of an Order
of the Benefits Review Board

Before CLEMENT, DUNCAN, and OLDHAM, Circuit Judges.

STUART KYLE DUNCAN, Circuit Judge:

Luigi Malta was injured while unloading a vessel on a fixed platform in the territorial waters of Louisiana. Malta made a claim against his employer, Wood Group Production Services (Wood Group), under the Longshore and Harbor Workers' Compensation Act. To enjoy coverage under the Act, a claimant must show both that he was in a place covered by the Act (situs) and that he was engaged in maritime employment (status). The Benefits Review Board concluded that because Malta—who spent 25 to 35 percent of his working hours loading/unloading vessels—was injured while unloading a

## No. 18-60542

vessel on a platform customarily used for that task, Malta satisfied both the situs and status requirements. We deny Wood Group's petition for review.[1]

### I.

Wood Group, which staffs personnel for clients in the oil and gas industry,[2] employed Malta as a warehouseman for the Black Bay Central Facility (Central Facility), a fixed platform located in the territorial waters of Louisiana.[3] Central Facility provides support services for oil and gas production occurring at various satellite production platforms in the Helis Black Bay Field. Twenty-two workers, including Malta, lived, worked, and slept at Central Facility, which comprises four separate platforms, connected by catwalks. A warehouse sits on one of these platforms, and in it the workers stored supplies and tools necessary for their sustenance and operations. Three cranes, located at various parts of Central Facility, assisted the workers as they loaded and unloaded these supplies from vessels, which often came from Venice, Louisiana. When workers on the satellite platforms required tools for their operations, the necessary items were taken from the warehouse and loaded onto vessels by crane. The vessels then travelled to the satellite platforms with these supplies.

Malta worked twelve hours each day—from sunup to sundown—seven days per week at Central Facility (and then he would rest shoreside for seven days). He never worked on any of the satellite platforms. His primary duties included ordering, receiving, and maintaining all supplies and equipment at the Central Facility warehouse. It is undisputed that, although not listed

---

[1] Wood Group's insurer—Authorized Group Self-Insurer Signal Mutual Indemnity Association, Ltd. c/o Coastal Risk Services, LLC—is also a petitioner.

[2] Here, Wood Group was a contractor for Helis Oil and Gas Company.

[3] Two photographs of Central Facility appear at the end of our opinion.

2

among his official job duties, a significant portion of Malta's "hitch" (shift), was dedicated to loading and unloading vessels arriving at and leaving from Central Facility. Wood Group's project manager, Ray Pitre, testified that this was a "big part" of Malta's job. And Malta testified that he spent roughly 25 to 35 percent of each hitch loading and unloading vessels.

Malta explained that he regularly would load/unload all sorts of things into/from the vessels: "It can be anywhere from piping to big valves, compressors, drinking water supplies, various items, nothing in particular everyday. It's just whenever we order and something is needed, [I] pull it off the work barge or the water barge." Pitre similarly testified that Malta would unload "a various assortment of things from rags to repair parts to nitrogen cylinders to valves and phalanges . . . [because] the oil industry uses just a vast assortment of supplies." During a typical 12-hour hitch, if a group of workers on a "satellite platform needed additional supplies and equipment," Malta "would help load the field boat." This required Malta, "depending on exactly what it was [and] how big it was, [to] put it on a basket, and send it down to the boat and then off to the respective platform or field operator." Malta testified that there was "no difference" between his duties and those of "a dock worker loading and unloading" vessels in Venice.

Malta was injured when unloading a boat owned by a third party. He received a call seeking help to offload something coming up from the boats (which had come from one of the satellite platforms). Malta did not go onto the vessel to retrieve the item. Rather, it was "sent up to [him] via crane" while he was standing on the platform in front of the warehouse. As the basket was coming up, he "grabbed the tag line, pulled it in[,] and as the basket collapsed," Malta saw that the item was a $CO_2$ cannister—which had been mistakenly marked as empty. While Malta was removing the cannister from the cargo basket, it exploded, and he was injured.

No. 18-60542

Malta made a claim for benefits against Wood Group under the Longshore and Harbor Workers' Compensation Act (LHWCA or Act), 33 U.S.C. § 901, *et. seq.* By way of background, the Act "provides compensation for the death or disability of any person engaged in 'maritime employment,'" under certain conditions. *Herb's Welding, Inc. v. Gray*, 470 U.S. 414, 415 (1985). Wood Group contested Malta's claim for benefits. None of the facts was disputed, and the only question was whether Malta was qualified to recover under the Act. After a hearing, an Administrative Law Judge (ALJ) initially ruled against Malta, concluding "that [because] the fixed platform on which [Malta] worked" was not covered under the Act, there was no jurisdiction to consider his claim. In light of this holding, the ALJ did not initially decide whether Malta enjoyed maritime status under § 902 of the Act.

The Benefits Review Board (Board) reversed the ALJ's decision, concluding the ALJ misapplied this court's precedent and the plain language of the statute. It held that Malta's "injury occurred on a covered situs" and remanded the case so that the ALJ could address Malta's status.

On remand, once again, none of the facts was in dispute. The only question was whether Malta enjoyed maritime status. The ALJ found that, because Malta "loaded or unloaded the cargo from a ship or vessel, he was performing a traditional maritime activity" and satisfied "the status requirement of the Act." Wood Group appealed to the Board, which affirmed the ALJ's decision.

Having exhausted its options before the Department of Labor, Wood Group filed a petition for review with this court, arguing that Malta cannot recover under the Act because he lacks status and his injury did not occur on

4

No. 18-60542

a covered situs. Both Malta and the Director of the Office of Worker's Compensation Programs[4] filed briefs defending the Board's decision.

II.

If "the facts are not in dispute"—as is true of this appeal—then whether a worker is covered under the Act presents a "pure question of law" that "is an issue of statutory construction and legislative intent." *New Orleans Depot Servs., Inc. v. DOWCP (Zepeda)*, 718 F.3d 384, 387 (5th Cir. 2013) (quoting *DOWCP v. Perini N. River Assocs.*, 459 U.S. 297, 300, 305 (1983)). Accordingly, we review the Board's decision de novo. *Id.*

III.

Wood Group contends the Board erred by reversing the ALJ's initial decision holding that Malta's injury failed to satisfy the Act's situs requirement. The current form of the situs requirement—found at § 903—says a claimant is eligible for benefits

> only if the disability or death results from an injury occurring upon the navigable waters of the United States (including any adjoining pier, wharf, dry dock, terminal, building way, marine railway, or other adjoining area customarily used by an employer in loading, unloading, repairing, dismantling, or building a vessel).

33 U.S.C. § 903(a). Congress has tinkered with the situs requirement. "Prior to 1972, the Act applied only to injuries occurring on navigable waters. Longshoremen loading or unloading a ship were covered on the ship and the gangplank but not shoreward, even though they were performing the same functions whether on or off the ship." *Chesapeake & Ohio Ry. Co. v. Schwalb*, 493 U.S. 40, 46 (1989). The Supreme Court has said that the current version of the situs requirement, which should be "liberally construed," covers "all those

---

[4] "The Director is a party to the litigation of disputed claims under the Act at all stages of the litigation." *Munguia v. Chevron U.S.A. Inc.*, 999 F.2d 808, 810 n.1 (5th Cir. 1993).

on the situs involved in the essential or integral elements of the loading or unloading process." *Id.* The Supreme Court has defined loading and unloading a vessel to mean "taking cargo out of the hold, moving it away from the ship's side, and carrying it immediately to a storage or holding area." *Ne. Marine Terminal Co. v. Caputo*, 432 U.S. 249, 266–67 (1977).

It is undisputed that Central Facility does not meet the definition of "navigable waters" or any of the structures enumerated in this section ("pier, wharf, dry dock, terminal, building way, marine railway"). So, under the language of the statute, Malta can recover only if his injury occurred on an "other adjoining area customarily used by an employer in loading [and] unloading a vessel." § 903(a).

This court has said that, "[t]o qualify as an 'other adjoining area,' the situs must be located in proximity to navigable waters (i.e., possess a geographical nexus) and have a maritime nexus—here, 'customarily used by an employer in loading . . . a vessel.'" *Coastal Prod. Servs. Inc. v. Hudson*, 555 F.3d 426, 432 (5th Cir. 2009) (quoting § 903(a)). These two factors have been described as the geographic and functional components of the situs test. *See Zepeda*, 718 F.3d at 389 (explaining that "'other adjoining area' must satisfy two distinct situs components: (1) a geographic component (the area must adjoin navigable waters) and (2) a functional component (the area must be 'customarily used by an employer in loading [or] unloading . . . a vessel'")). "To satisfy the situs inquiry's functional prong, the site of the injury need not be 'exclusively' or 'predominantly' used for unloading—only customarily." *BPU Mgmt., Inc./Sherwin Alumina Co. v. DOWCP (Martin)*, 732 F.3d 457, 461 (5th Cir. 2013). And the court looks to "the general purpose of the area rather than requiring 'every square inch of an area' to be used for a maritime activity." *Id.*

It is undisputed that Central Facility—situated in the territorial waters of Louisiana—has a geographical nexus to navigable waters. So the situs

question boils down to whether Central Facility, or at least the part of it where Malta was injured, meets the functional component of the test—*i.e.*, whether it is "customarily used" in loading and unloading vessels.

Wood Group offers two reasons to support its position that Malta's injury does not satisfy the situs requirement: (a) the purpose of Central Facility was oil and gas production, and so it did not have a maritime purpose; and (b) the items Malta loaded/unloaded were not maritime cargo.

The Board rejected Wood Group's argument and compared the platform where Malta was injured to an offshore dock, emphasizing the plain language of the statute:

> In a case like this one in which claimant is injured in an area that is customarily used for loading and unloading vessels, it follows that the requisite relationship with maritime commerce is established for purposes of the functional component of the situs test, and any further inquiry into whether there is an independent connection to maritime commerce is superfluous.

But, despite the plain language of the statute, Wood Group contends—and the ALJ initially agreed—that the Board's situs reasoning conflicts with this court's precedent as illuminated by Wood Group's two arguments. We address, and reject, each argument in turn.

## A.

Wood Group first contends that Central Facility cannot satisfy the situs requirement because it did not have a "maritime purpose." The text of the Act does not expressly include any "maritime purpose" requirement. So, to support its position, Wood Group relies principally on this court's opinion in *Thibodeaux v. Grasso Production Management, Inc.*, 370 F.3d 486 (5th Cir. 2004). In that case, Randall Thibodeaux worked as "a pumper/gauger" on "a fixed oil and gas production platform," and, "[a]s part of his duties," he "monitored gauges both on the platform and on nearby wells." *Id.* at 487.

Thibodeaux's injury occurred after he noticed an oil leak five feet below the deck of the platform. Because a small wooden platform under the deck offered a better vantage to view the leak, he jumped down onto the wooden platform. The wood gave way, Thibodeaux fell into the marsh, and a nail stabbed his hand. *Id.* at 488. Describing the mishap, the court noted that "[t]he accident did not occur on the portion of the platform used to dock the two vessels." *Id.*

After Thibodeaux made a claim under the Act, the "sole issue" before the court was "whether a fixed oil production platform built on pilings over marsh and water inaccessible from land constitutes either a 'pier' or an 'other adjoining area' within the meaning of § 903(a)." *Id.* (footnote omitted). The court decided that "[t]he maritime nature of the LHWCA imparts a meaning to § 903(a)'s enumerated terms that goes beyond their use in ordinary language." *Id.* at 490–91. And, "when viewed together in the context of the LHWCA, a connection to maritime commerce becomes the unifying thread connecting the listed structures" in the Act—*i.e.*, "pier, wharf, dry dock, terminal, building way, marine railway." *Id.* at 491 (discussing § 903(a)). So, the court reasoned, "in light of the statute's origin and aim, it would be incongruous to extend it to cover accidents on structures serving no maritime purpose." *Id.* Because the "work commonly performed on oil production platforms is not maritime in nature," and because "to be a pier within the meaning of the LHWCA a structure must have some maritime purpose," the court held that the oil production platform where Thibodeaux worked did not meet that standard. *Id.* at 493. The court bolstered this reasoning by noting that Supreme Court precedent "considered fixed oil production platforms to be islands." *See id.* at 492 (discussing *Herb's Welding*, 470 U.S. at 422 n.6; *Rodrigue v. Aetna Casualty & Surety Co.*, 395 U.S. 352, 360 (1969)). And, islands, of course, are not covered under the Act. *See id.*

The *Thibodeaux* court also considered whether the platform was an "other adjoining area" under the Act. *Id.* at 494. Even construing the term "area" broadly to include not just the wooden platform but also the production platform, the court determined that the oil production platform was not "the site of significant maritime activity." *Id.* Thus, the court denied Thibodeaux's claim because the injury did not occur on a covered situs.

Wood Group contends that if even an enumerated structure (*e.g.*, a pier as discussed in *Thibodeaux*) requires a "maritime purpose" then, *a fortiori*, an "other adjoining area" like Central Facility must also have a "maritime purpose" to qualify as a covered situs. Wood Group disagrees with the Board's characterization of the Central Facility platform as an "offshore dock." Because Central Facility is a fixed platform with the purpose of finding and producing oil—like the fixed oil production platform in *Thibodeaux*—Wood Group argues Central Facility does not have a maritime purpose. Thus, according to Wood Group, Malta's injury cannot satisfy the statutory situs requirement.

In response, Malta and the Director emphasize the features of Central Facility that differ from the fixed platform discussed in *Thibodeaux*. Specifically, Malta points out that, as evidenced by the pictures in the record, Central Facility is not a standalone fixed platform. It is a facility designed as a central hub to support a multitude of smaller platforms in and around the oilfield. Central Facility comprises four platforms and includes a safe harbor designed to allow for loading and unloading vessels in rough seas. Third-party vessels service the surrounding facilities, including a vessel that travels daily between Central Facility and Venice, Louisiana. Importantly, Central Facility is equipped with three cranes and a fulltime crane operator who works with the dedicated warehousemen (including Malta) to load and unload vessels throughout the day.

9

No. 18-60542

Moreover, Malta and the Director contend the Board was correct when it determined that the plain language of the Act is dispositive here. Although this court has said that "the mere act of loading, unloading, moving, or transporting something is not enough"—because, of course, these activities can occur in non-maritime contexts—loading/unloading is maritime when "undertaken with respect to a ship or vessel." *Martin,* 732 F.3d at 462.

We are not persuaded by Wood Group's argument that the purpose of the structure where the injury occurred is the Alpha and Omega of the situs inquiry, regardless of whether the platform is customarily used for loading/unloading vessels. This does not comport with either the plain text of the statute or the Supreme Court's command to construe the Act liberally. *See Schwalb*, 493 U.S. at 46; *see also Estate of Cowart v. Nicklos Drilling Co.*, 505 U.S. 469, 475 (1992) ("[W]hen a statute speaks with clarity to an issue judicial inquiry into the statute's meaning, in all but the most extraordinary circumstance, is finished."). Here, it is undisputed that significant unloading occurred on the dock where Malta was injured. Indeed, Malta was injured while unloading a boat. And Wood Group's argument overlooks significant nuance in *Thibodeaux*, which expressly noted that "[t]he accident did not occur on the portion of the platform used to dock the two vessels." 370 F.3d at 488. The *Thibodeaux* court observed that minor maritime activity occurring in specific areas of the fixed platform—where the injury did not occur—did not transform the entire platform into a covered situs. It does not follow from this unobjectionable proposition, however, that an injury should evade coverage if it occurs on a specific portion of a platform where loading/unloading *does* occur merely because the general purpose of the entire platform is dedicated to another task. Wood Group's heavy reliance on *Thibodeaux* is misplaced.

10

No. 18-60542

B.

The second piece of Wood Group's situs argument is that the Board erred by finding that the nature of the items Malta loaded and unloaded was "irrelevant" to determining whether an "other adjoining area" satisfies the functional component of the situs inquiry. Wood Group's argument is that, to meet the situs requirement, the cargo being loaded/unloaded from a vessel must be "product to be delivered into the stream of commerce."[5] According to Wood Group, the items Malta loaded/unloaded were not maritime "cargo" under its definition because the vessels were loaded with supplies used by the workers on the platforms with the purpose to produce oil and gas. The language of the statute's situs requirement does not use the word "cargo." But Wood Group contends that the Board's reasoning conflicts with several opinions of this court that at least implicitly read a maritime cargo requirement into the Act.

Wood Group looks for support in *Coastal Production Services Inc. v. Hudson*, 555 F.3d at 428. In *Hudson*, a fixed platform with living quarters was connected to a sunken storage barge by pipes and a walkway. *Id.* The platform collected oil via pipeline from surrounding satellite wells, processed that oil, and then transferred it into the sunken barge. Vessels would then dock at the

---

[5] Wood Group contends that "[c]rucial in determining whether an item constitutes 'cargo,' is pinpointing the exact point at which the item in question 'moves from the stream of maritime commerce and longshoring operations to . . . its ultimate destination." (quoting *McKenzie v. Crowley Am. Transp., Inc.*, 36 BRBS 41, 2002 WL 937755 at \*5 (April 3, 2002)). Wood Group supports this contention by citing numerous trucking cases that limit recovery under the Act for truckers picking up stored cargo. Wood Group contends that these cases stand for the proposition that when items have reached their ultimate destination in the stream of commerce, they cease being "cargo." According to Wood Group, the items initially shipped to the warehouse at Central Facility had reached their final destination and were no longer cargo, even when later shipped to the satellite platforms. Wood Group misreads these cases, which do not graft a maritime cargo requirement onto the text of the statute. Instead, they detail when coverage under the Act applies (or does not apply) to truckers involved (or not) in loading and unloading a vessel. *See, e.g., id.* at \*6 ("In this case, claimant drove a truck not to move cargo as part of a loading process, but to start it on its overland journey.").

barge to be loaded with oil. *Id.* While on the fixed platform (not on the barge where the loading occurred), Terry Hudson was injured when a saltwater disposal pump he was fixing exploded. *Id.* at 429. The question for the court was whether the situs requirement was satisfied even though Hudson was injured on the fixed platform. Wood Group points to a line from *Hudson* that notes the "[v]essels were not loaded or unloaded directly from the [fixed] platform, *at least not with cargo.*" 555 F.3d at 434 (emphasis added). Wood Group argues that, from this line of text, the court should conclude that, although *something* was being loaded and unloaded from the fixed platform, whatever it was apparently was not "cargo" as Wood Group defines that term. As a result, whatever loading/unloading activity was occurring on the fixed platform was insufficient to render it a covered situs under the Act.

Even assuming the *Hudson* court meant to freight that one stray line of text with such meaning, the court held that the platform was a covered situs under the Act on other grounds, and so the language was dicta. Under the plain language of the statute, coverage extends to an area "customarily used by an employer in loading [or] unloading . . . a vessel." *Zepeda*, 718 F.3d at 389. When the plain language of the statute is clear, as it is here, that ends our inquiry. *See Cowart*, 505 U.S. at 475. In any event, we do not read *Hudson* to add anything to the statute, including a maritime cargo requirement.

Wood Group also looks to this court's decision in *Martin* to support its position. 732 F.3d at 459. David Martin was injured in an "underground transport tunnel." *Id.* The court held that the tunnel did not meet the situs requirement because the tunnel was not "'customarily used' for unloading vessels." *Id.* at 461. In arriving at this conclusion, the *Martin* court reiterated this court's analysis that "the primary purpose of . . . loading and unloading [is] to get cargo on or off the [vessel]." *Id.* at 462. The facility where Martin worked processed bauxite (a clayey rock that is the chief commercial ore of

aluminum), and some of the bauxite, which was delivered to the facility by ship, would go through the underground tunnel where Martin was injured. But the bauxite would enter the tunnel only after it "[sat] in a long-term storage stockpile, migrate[d] to the bottom of its respective ore pile, [was] specifically selected . . . for production, [was] crushed in the screw feeder, and [was] finally transported towards the metal-extraction facility." *Id.* at 464. The court concluded that the "[o]re at this stage is clearly no longer being 'unloaded' from a vessel in any sense of the word." *Id.*

Wood Group argues that *Martin* shows the nature of the items being unloaded matters when determining whether a structure serves a maritime purpose. According to Wood Group, the bauxite ceased being "cargo" before it arrived at the underground tunnel, and because Martin was unloading something other than maritime cargo, he was ineligible for coverage under the Act. But Wood Group reads too much into *Martin*, which addressed the express term "unloading" in the statute. § 903(a). The court explained that the long process the bauxite took before entering the tunnel was not "unloading." And "the fact that surface-level storage buildings are connected to the unloading process [did] not automatically render everything above and below the buildings [including underground transport tunnels] a part of the unloading process." 732 F.3d at 461–62. Whether the bauxite was "cargo" was irrelevant.

Nor does this court's opinion in *Munguia v. Chevron U.S.A. Inc.*[6] offer refuge to Wood Group's position. Noel Munguia, a pumper-gauger, was injured while working on a fixed well platform. 999 F.2d at 809. The court listed Munguia's duties as follows: "He loaded onto [a] boat the tools and equipment

---

[6] The court in *Munguia* was asked to decide whether the claimant satisfied the *status* requirement of the Act, not the *situs* requirement. But because Wood Group contends the nature of the cargo is relevant to both the situs and status inquiries, we address Wood Group's argument here.

he would need for the day and then navigated the boat to and from the various platforms. At each platform he unloaded the tools and equipment needed to do the work required at that platform." *Id.* at 812. The court noted that his duties "involved little or no loading and unloading of boats." *Id.* And the court downplayed the loading/unloading that the claimant performed: "Because the transfer of small amounts of supplies between tank batteries by Munguia and his fellow roustabouts . . . [furthered] the non-maritime-related purpose of servicing and maintaining the fixed platform wells, the mere fact that Munguia may have loaded and unloaded them onto his skiff cannot confer coverage." *Id.* at 813. The court further explained that "[a]ny contact Munguia may have had with cargo was fleeting, unrelated to maritime commerce, and usually at a time by which these supplies no longer possessed the properties normally associated with 'cargo.'" *Id.*

Wood Group contends this language adds a maritime cargo requirement to the Act, but *Munguia*, like *Martin*, merely glosses the Act's express terms "loading and unloading." According to *Munguia*, if a claimant unloads nothing more than personal gear from a boat in furtherance of pursuits not customarily thought of as maritime commerce, that claimant has failed to satisfy the loading/unloading requirement because he has performed "little or no loading and unloading of boats." Moreover, the facts of *Munguia* are distinguishable from Malta's case in important respects. First, it is undisputed that Malta spent at least 25 percent of his hitch unloading vessels. But the rare loading/unloading Munguia performed applied only to his own personal gear. And although Wood Group attempts to characterize the items Malta unloaded as his own personal tools and equipment, Malta used a crane to unload vessels containing tools and supplies for the use of 22 men on multiple satellite production platforms throughout the oilfield.

14

No. 18-60542

Wood Group again looks to *Thibodeaux* for support. When finding the Act did not extend to Thibodeaux, this court explained that, "[a]lthough personal gear and occasionally supplies [were] unloaded at docking areas on the platform, the purpose of the platform is to further drilling for oil and gas, which is not a maritime purpose."[7] 370 F.3d at 494. Wood Group reads this analysis as grafting a maritime cargo requirement onto the plain language of the statute. But, again, Thibodeaux's accident did not occur on the part of the platform where the loading/unloading occurred, and those activities were limited in any event. Under the Act, the nature of the items loaded and unloaded is not determinative. Rather, coverage under the Act extends to "all those on the situs involved in the essential or integral elements of the loading or unloading process." *Schwalb*, 493 U.S. at 46. And Malta, unlike Thibodeaux, was injured while unloading a boat on a platform used to load and unload boats. So, the cases are distinguishable and coverage extends to Malta.

In sum, because the Board correctly applied the plain language of the Act,[8] we affirm its conclusion that Malta met the situs requirement.

---

[7] Like the platform in *Thibodeaux*, oil is not shipped directly from Central Facility.

[8] The Board, Malta, and the Director view this court's opinion in *Gilliam v. Wiley N. Jackson Co.* as settling the proposition that the use to which cargo will be put after its unloading is irrelevant to the question of coverage under the Act. 659 F.2d 54 (5th Cir. 1981). There the court held that the Act covered a worker injured while unloading a vessel even though the pilings unloaded from the supply barge were used in the construction of a bridge at the site of the unloading. *Id.* at 55. To avoid the force of this case and its holding, Wood Group argues that it is no longer good law after the Supreme Court's holding in *DOWCP v. Perini North River Associates*, 459 U.S. 297 (1983), and this court's later decision in *Fontenot v. AWI, Inc.*, 923 F.2d 1127 (5th Cir. 1991). In light of our holding that the Board correctly applied the plain language of the statute, we need not address this issue.

No. 18-60542

IV.

Wood Group also challenges the Board's conclusion that Malta meets the Act's maritime status requirement. That requirement—located at § 902—is satisfied by

> any person engaged in maritime employment, including any longshoreman or other person engaged in longshoring operations, and any harbor-worker including a ship repairman, shipbuilder, and ship-breaker.

§ 902(3). The Supreme Court has characterized the requirement as "an occupational test that focuses on loading and unloading." *P. C. Pfeiffer Co. v. Ford*, 444 U.S. 69, 80 (1979); *see Schwalb*, 493 U.S. at 46 ("[Section] 903(a) extended coverage to the area adjacent to the ship that is normally used for loading and unloading, but restricted the covered activity within that area to maritime employment.").

This court has explained that "[a]n employee may qualify for maritime status based on either (1) the nature of the activity in which he is engaged at the time of the injury or (2) the nature of his employment as a whole." *Hudson*, 555 F.3d at 439. A claimant will satisfy the status requirement if he spends at least some time loading or unloading ships, and this court has expressly ruled that this time need not be "substantial." *Boudloche v. Howard Trucking Co.*, 632 F.2d 1346, 1347 (5th Cir. 1980) (holding that a worker who only spent 2.5 to 5 percent of his time loading and unloading was covered under the Act); *see also Caputo*, 432 U.S. at 273; *Hudson*, 555 F.3d at 440 (concluding claimant was covered even though he spent less than 10 percent of his time in maritime activities). But if a claimant "was not injured on actual navigable waters at the time of the injury, then the employee is engaged in 'maritime employment' only if his work is directly connected to the commerce carried on by a ship or vessel." *Fontenot*, 923 F.2d at 1130.

16

The undisputed record shows that Malta—who spent 25 to 35 percent of his hitches loading/unloading vessels—was injured while unloading a vessel. This seems, on its face, to satisfy the maritime status requirement. And, indeed, the Board affirmed the ALJ's ruling that Malta satisfied the status requirement, reasoning that Malta was covered "based on both his overall job, a portion of which involved loading and unloading vessels, and the covered employment duties he was performing at the moment of injury."

Wood Group contends that the Board reversibly erred because the purpose of Malta's employment was not maritime in nature as his loading/unloading did not "enable a ship to engage in maritime employment."[9] *See Trotti & Thompson v. Crawford*, 631 F.2d 1214, 1221 n.16 (5th Cir. 1980). Wood Group explains that the "sole purpose" of Malta's work on Central Facility was oil and gas exploration and production. And all the items he loaded/unloaded were intended solely for that purpose. So Malta's loading/unloading was "incidental to non-maritime work" and cannot constitute maritime employment as required by the status requirement.

Wood Group supports this argument with discussions of three Board opinions. But we conclude that none of these opinions is helpful to Wood Group. In *Smith v. Labor Finders*, Lee Smith worked as a "beach-walker"—gathering oil residue and pollutants after an oil spill from the beaches of an island dedicated as a wildlife preserve. Each day, Smith would load his tools and supplies into a boat and ride for 30-45 minutes to/from the mainland. After Smith gathered the oil and pollutants, another crew would then bag and load

---

[9] Wood Group also contends that Malta lacks maritime status because his loading/unloading was not connected to maritime commerce. To advance this position, Wood Group again relies on the "maritime cargo" argument we rejected when determining that Malta satisfied the situs requirement. Because no cargo requirement appears in the language of § 902(3), we similarly reject Wood Group's maritime cargo argument in the context of Malta's status.

them into a boat. Smith was injured after his trailer crashed into another trailer when returning to the transport boat. The Board denied Smith's claim for recovery under the Act after concluding that Smith's "work duties were not in furtherance of 'maritime commerce' because [Smith's] purposes in cleaning up the island were to protect the wildlife preserve." No. BRB No. 12-0035, 2012 WL 4523618, at \*4 (DOL Ben. Rev. Bd. Sept. 11, 2012). Wood Group contends that Malta's case is similar because the purpose of his work was oil and gas production. But this argument overlooks the fact that the Board found it relevant that Smith "did not routinely participate in the loading/unloading of the collected oil onto vessels." *Id.* at \*5. Plus, Smith was injured on a trailer, and he was not engaged in loading/unloading a vessel at the time of his injury. The facts of Malta's case are clearly distinguishable. So it is unclear how this case shows that the loading/unloading Malta performed could be "incidental to non-maritime work."[10]

In *Hough v. Vimas Painting Co., Inc.*, the claimant vacuumed up and disposed of debris that accumulated from the cleaning of a bridge. The vacuum deposited the debris into a machine on a barge. The Board found it significant that "the debris was merely collected and stored on the barge until the end of the bridge cleaning project; the vacuumed debris did not 'enable' the barge to 'engage in maritime commerce.'" No. BRB No. 10-0534, 2011 WL 2174854, at \*7 (DOL Ben. Rev. Bd. May 24, 2011). And the Board found that "[n]either the vacuumed debris nor claimant's role in vacuuming the debris was integral to

---

[10] Wood Group also directs us to another decision by the Board that relied heavily on *Smith*'s analysis, *Miller v. CH2M Hill Alaska, Inc.*, Ben. Rev. Bd No. 13-0069, 2013 WL 6057071 (DOL Ben. Rev. Bd. Sept. 25, 2013). There the Board explained that "there is no significant distinction to be drawn between this case and *Smith*." *Id.* at \*6. Because there is "no significant distinction" between these cases, the reasons for concluding that *Smith* is unhelpful to Wood Group apply equally to *Miller*.

any maritime purpose." *Id.* The Board concluded that, "[b]ecause claimant's work was neither maritime in nature nor integral to maritime commerce, . . . claimant's vacuuming of debris from the bridge does not constitute 'loading' as that term relates to coverage under the Act." *Id.* Wood Group similarly contends that Malta's work was not integral to maritime commerce. But there is a great deal of daylight between the facts of Malta's case and those of *Hough*. For one thing, the ALJ found that the claimant grew sick while working on the bridge, not the barge. And, for another, vacuuming debris from a bridge onto a vessel is quite different from the loading/unloading activities that Malta undertook. Ultimately, the Board's analysis was geared to determining whether the vacuuming could be considered "loading" a vessel as that term is understood in the Act. There is no dispute that Malta was loading/unloading vessels at the time of the injury.

In the third case, *Bazenore v. Hardaway Constructors, Inc.*, the claimant was injured while working in a construction yard cutting poles with a chainsaw. The Board noted that "claimant's work essentially facilitated the sale of construction materials to a nonmaritime customer, and as such did not in any way further maritime commerce." No. BRB no. 83-2842, 1987 WL 107407, at *2 (DOL Ben. Rev. Bd. June 18, 1987). This fact "support[ed] the administrative law judge's determination that any connection to the ship-loading, ship-construction, and harbor-maintenance processes was too attenuated to afford coverage." *Id.* Because cutting poles for nonmaritime customers in a construction yard differs significantly from the loading/unloading occurring here, *Bazenore* is inapposite.

At bottom, because Malta's injury occurred when he was loading/unloading a vessel, and because he regularly loaded/unloaded vessels, the status requirement is satisfied. The cases Wood Group relies on offer no

No. 18-60542

real support for the contention that Malta's employment takes him outside the ambit of the statute.

    The petition for review is DENIED.



No. 18-60542

